Filed 9/4/14 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

<table>
<tr><td>

SAN FRANCISCO TOMORROW et al.,

     Plaintiffs and Appellants,

v.

CITY AND COUNTY OF SAN FRANCISCO et al.,

     Defendants and Respondents,

PARKMERCED INVESTORS PROPERTIES, LLC.,

     Real Party in Interest and Respondent.

</td><td>

A137753

(City and County of San Francisco Super. Ct. No. CPF11511439)

**ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PARTIAL PUBLICATION [NO CHANGE IN JUDGMENT]**

</td></tr>
</table>

THE COURT:

     The opinion in the above-entitled matter filed on August 14, 2014, was certified for partial publication in the Official Reports. After the court's review of requests under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that part II.A. of the opinion should be published in the Official Reports.

Date: _____       _____

                                               Kline, P.J.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.

1

Trial Court:                                      San Francisco Superior Court

Trial Judge:                                      Hon. Teri L. Jackson


Attorneys for Plaintiffs and Appellants:          Law Offices of Stuart M. Flashman
                                                  Stuart M. Flashman

Attorneys for Amicus Curiae on behalf of          Chatten-Brown & Carstens
Plaintiffs and Appellants:                        Jan Chatten-Brown
                                                  Josh Chatten-Brown

Attorneys for Defendants and Respondents:         San Francisco City Attorney
                                                  City Attorney Dennis J. Herrera
                                                  Kate H. Stacy
                                                  Audrey Williams Pearson
                                                  Brian F. Crossman

Attorneys for Real Parties in Interest:           Gibson Dunn & Crutcher
                                                  Daniel Kolkey
                                                  Jeffrey D. Dintzer
                                                  Matthew C. Wickersham

Filed 8/14/14 (unmodified version)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SAN FRANCISCO TOMORROW et al.,<br><br>　　　Plaintiffs and Appellants,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>　　　Defendants and Respondents;<br><br>PARKMERCED INVESTORS PROPERTIES, LLC.,<br><br>　　　Real Party in Interest and Respondent. | A137753<br><br>(City and County of San Francisco Super. Ct. No. CPF11511439) |

**INTRODUCTION**

Appellants San Francisco Tomorrow and Parkmerced Action Coalition (PMAC) appeal the San Francisco Superior Court's denial of appellants' petition for writ of mandate seeking to overturn the decision by respondents City and County of San Francisco (City) and its Board of Supervisors (Board) approving the Parkmerced Development Project (the project). The project involves the long-term redevelopment of the privately owned, 152-acre Parkmerced Property by real party in interest Parkmerced Investors Properties, LLC.

Appellants challenge the court's denial of their writ petition contending: (1) The Land Use Element (sometimes called the Urban Design Element) of the San Francisco General Plan (General Plan) is inadequate for failing to include standards for population

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A. through III.

1

density and building intensity. (Gov. Code, § 6302, subds. (a), (b).) (2) The project and the various project approvals are inconsistent with the "priority policies" and other policies of the General Plan. (3) The environmental impact report (EIR) and the findings underlying the City's approval of the project were inadequate under standards established by the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.). (4) The court erred in sustaining a demurrer to appellant PMAC's cause of action for violation of its due process rights. (5) The court erred in including in the administrative record, transcripts of proceedings before an advisory body that were not before the Board when it certified the EIR and approved the project. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Project

The Parkmerced Project involves major modifications to Parkmerced, a 3,221 unit residential rental complex on 152 acres. The site is located near Lake Merced, in the southwest corner of San Francisco. It is surrounded by the Stonestown Galleria shopping mall, San Francisco State University, two golf courses, and residential neighborhoods.

The original Parkmerced complex was built in the 1940s by MetLife as one of eight large-scale developments created around the country to provide affordable middle-income housing. The architect for Parkmerced was the New York City firm Leonard Schultze & Associates and its design involved noted San Francisco architect Frederick H. Meyer. The landscape plan was designed by famed San Francisco architect Thomas Church, designer of the master plans for University of California Berkeley and Santa Cruz Campuses, among other notable landscapes. Originally consisting of 192 acres and 3,483 residential units, significant portions of the site were sold-off to San Francisco State University and to various private owners. The remaining complex, which is the subject of the project and resulting CEQA review, consists of 152 acres and 3,221 residential units. Parkmerced Investors has owned the complex since October 2005. The complex's housing is currently divided between eleven 13-story towers containing 1,683 rental units and 170 2-story "townhouse" buildings containing 1,538 units. Over the

course of 20 to 30 years, the project would demolish all townhouse units, build an equal number of replacement units and add 5,679 units for a total of 8,900 units. Of the new non-replacement units, some would be rental units, while others would be sold. Some of the new units would be below-market-rate units, as required by City ordinance. The remainder would be market-rate units.

As described, "The proposed Project is a long-term (approximately 20-30 years) mixed-use development program to comprehensively re-plan and re-develop the approximately 116-acre Site (152-acres including streets). The Project proposes to increase the residential density, provide new commercial and retail services, provide new transit facilities, new parks and open space amenities and improve existing utilities and stormwater management systems within the development Site. Of the existing 3,221 residential units on the Site, approximately 1,683 units located within the 11 existing towers would remain and approximately 1,538 existing apartments would be demolished and replaced in phases over the approximately 20 to 30-year development period. As provided in the proposed [d]evelopment [a]greement, all 1,538 new replacement units would be subject to the San Francisco Rent Stabilization Ordinance and existing tenants in the to-be-replaced existing apartment units would have rights to relocate into new replacement units of equivalent size with the same number of bedrooms and bathrooms at their existing rents. An additional 5,679 net new units would also be added to the Site for a project total of 8,900 units. New buildings on the Site would range in height from 35 feet to 145 feet, and would not be taller than the existing towers, which will remain.

"Neighborhood-serving retail and office space would also be constructed as part of the proposed Project and concentrated on Crespi Drive, near the northeast part of the Site and the light-rail line. The proposed new neighborhood core would be located within walking distance of all the residences within Parkmerced. In addition, small neighborhood-serving retail establishments would be constructed outside of the neighborhood core, in proximity to residential units throughout the Site. A new preschool/elementary school and daycare facility site, fitness center, and new open space uses including athletic fields, walking and biking paths, a new farm, which the Sponsor

3

proposes will be organic, and community gardens would also be provided on the Project Site. Infrastructure improvements would include the installation of bioswale system to retain and treat stormwater on-site and renewable energy sources, such as wind turbines and photovoltaic cells, which are detailed in the Sustainability Plan. Transportation improvements would include the realignment of the Muni M-Oceanview light-rail line through the Project Site, redesign and redevelopment of all public streets within the Project Site to meet the City's Better Streets design standards, provision of car-share and bike-sharing stations throughout the Project Site, pedestrian safety and traffic improvements to intersections adjacent to the Project Site, construction of new bicycle paths, provision of a free shuttle service to Daly City BART and other items detailed in the Transportation Plan."

**B. Project Approvals**

In addition to an EIR, prepared pursuant to CEQA, project approval also required amendments to the City's General Plan, Zoning Map, and Planning Code (to add the Parkmerced Special Use District [sometimes referred to as the SUD]), as well as approval of a Local Coastal Zone Permit and the negotiated development agreement between the City and real party (collectively Project Approvals).

Real party applied to the City for environmental review of the project in January 2008. In May 2009, the City issued a Notice of Preparation for the project EIR. The Draft EIR (DEIR) was released for public review on May 12, 2010. A 60-day public comment period followed. The City's Historical Preservation Commission held a hearing to receive input on the DEIR. The Comments and Responses document was released on October 28, 2010, and informational meetings were held by the Planning Commission. On February 10, 2011, the Planning Commission held a formal public hearing and voted to certify the project's Final EIR (FEIR) and to recommend that the Board of Supervisors approve the project and related Project Approvals.

On March 1 and 2, 2011, appellants and others filed timely appeals with the Board of Supervisors contesting certification of the FEIR. The Board heard the appeal on March 29, 2011, and took public comment. After close of the public comment, the Board

4

voted to continue the item. Meanwhile, the Board's Land Use and Economic Development Committee (LUEDC) took additional public comment on the remaining Project Approvals. The LUEDC held four hearings—on March 28, April 18, May 16, and the morning of May 24, 2011. At the May 16 and May 24 meetings, the LUEDC discussed and approved amendments to the approvals. At the end of the May 24 hearing, the LUEDC forwarded the amended documents to the Board without recommendation.

On the afternoon of May 24, 2011, the Board of Supervisors held a hearing on the continued EIR appeal and the Project Approvals. At the end of that meeting, the Board denied the appeal, upheld certification of the EIR and approved the project. On June 6, 2011, the Board of Supervisors finalized the Project Approvals. The mayor signed the approvals on June 10, 2011, and a Notice of Determination was filed that day.

## C.  The Petition for Writ of Mandate

Appellants filed their "Verified Petition for Peremptory Writ of Mandate and Complaint for Injunctive and Declaratory Relief" on July 11, 2011. Disputes over the content of the record followed and appellants moved to "Clarify the Extent of the Administrative Record," seeking to exclude certain hearings from the record. The court granted in part and denied in part the motion, ordering hearings before the LUEDC and the Historic Preservation Commission to be transcribed and included in the record and excluding two hearings occurring after the Board's certification of the EIR. The trial court also granted real party's demurrer (joined in by the City) to the seventh and eighth causes of action of PMAC for declaratory relief and for violation of due process rights. The operative pleading, the "Verified Third Amended Petition for Peremptory Writ of Mandate," was filed on April 6, 2012. Following a hearing on the merits of the petition, the trial court took the matter under submission. It issued its order denying the petition on all counts on December 14, 2012. Judgment was entered on January 16, 2013, and this timely appeal followed.

5

# DISCUSSION

## I. General Plan Adequacy

### A. General Plan

"The Legislature has required every county and city to adopt 'a comprehensive, long-term general plan for the physical development of the county or city. . . .' (Gov. Code, § 65300.) A general plan provides a ' "charter for future development" ' and sets forth a city or county's fundamental policy decisions about such development." (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 815 (*Friends of Lagoon Valley*).)

" '[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.' [Citation.] 'Since consistency with the general plan is required, absence of a valid general plan, or valid relevant elements or components thereof, precludes enactment of zoning ordinances and the like.' [Citation.] 'The general plan consists of a "statement of development policies . . . setting forth objectives, principles, standards, and plan proposals." [Citation.] The plan must include seven elements—land use, circulation, conservation, housing, noise, safety and open space—and address each of these elements in whatever level of detail local conditions require [citation].' " (*Fonseca v. City of Gilroy* (2007) 148 Cal.App.4th 1174, 1182.)

"The adoption or amendment of a general plan is a legislative act. (Gov. Code, § 65301.5.) A legislative act is presumed valid, and a city need not make explicit findings to support its action. [Citations.] A court cannot inquire into the wisdom of a legislative act or review the merits of a local government's policy decisions. [Citation.] Judicial review of a legislative act under Code of Civil Procedure section 1085 is limited to determining whether the public agency's action was arbitrary, capricious, entirely without evidentiary support, or procedurally unfair. [Citations.]" (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1195.) "[O]nly those portions of the general plan which are impacted or influenced by the adoption or amendment can properly be challenged in the action which is brought." (*Garat v. City of*

6

*Riverside* (1991) 2 Cal.App.4th 259, 289-290, overruled in part on another ground as stated in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743, fn. 11.)

Appellants attack the San Francisco General Plan itself, arguing the Urban Design Element of the General Plan is inadequate for failing to include standards for population density and building intensity as required by Government Code section 65302, subdivision (a), which provides in pertinent part: "The [general] plan shall include the following elements: [¶] (a) A land use element that designates the proposed general distribution and general location and extent of the uses of the land . . . . The land use element shall include a statement of the standards of population density and building intensity recommended for the various districts and other territory covered by the plan. . . ."

The trial court concluded that a reasonable person could conclude, as did the City, that Table I-27 and Map I-2 in the General Plan's Housing Element, and Maps 4 and 5 in the Urban Design Element provide the information described in Government Code section 65302, subdivision (a). We agree.

**1.** *Population density.* The terms "population density" and "building intensity" are not defined by the statute. In *Twain Harte Homeowners Assn. v. County of Tuolumne* (1982) 138 Cal.App.3d 664 (*Twain Harte*), the court determined "the reasonable interpretation of the term 'population density' as used in Government Code section 65302 is one which refers to numbers of *people* in a given area and not to dwelling units per acre, unless the basis for correlation between the measure of dwelling units per acre and numbers of people is set forth explicitly in the plan." (*Id.* at p. 699, fn. omitted.)

The Urban Design Element of the General Plan includes a Land Use Index. This index includes land use maps and references to land use policies scattered through other elements. Appellants acknowledge, as they must, that the actual layout of a general plan is generally within the local agency's discretion. (Gov. Code, § 65301; see *Garat v. City of Riverside, supra*, 2 Cal.App.4th 259, 296 [plan may be adopted in any format deemed appropriate or convenient, including combining of elements, a single document or group of documents relating to subjects or geographic segments of the planning area].) The

7

Land Use Index has a section labeled "Population Density and Building Intensity Standards." This section points to density and intensity standards in the commerce, industry and housing elements, and various area plans. It also has a series of maps depicting citywide guidelines for building height and building bulk, and which depict a citywide commercial and industrial density plan expressing densities in terms of a FAR (Floor Area Ratio), the ratio between gross floor area to lot area. However, the identified "area plans" do not include the Parkmerced area.

The section of the Housing Element describing the existing housing stock contains a Table (I-27, "*Generalized Housing Densities Allowed by Zoning*") and corresponding Map (I-2, "*Generalized Housing Densities Allowed by Zoning*") that together provide an adequate description of the population densities for the Parkmerced area. Table I-27 of the Housing Element set forth five categories of housing density (low, moderately low, medium, moderately high, and high) and specifies the types of zoning districts that relate to each category. For each category, the Table states both the "average units per acre" and the "population density," in addition to describing the general locations where these density levels may be found. Map I-2, on the following page, shows the locations of each housing density category throughout the City. A narrative preceding the table and map describes them: "Table I-27 offers a listing of the City's zoning categories that permit residential development, grouping these by generalized housing density levels. Map I-2 provides a generalized illustration of housing densities citywide." The map identifies portions of the Parkmerced site as "medium density," corresponding to an average population density of 124 persons per acre, and other portions as "high density" corresponding to an average population density of 651 persons per acre. Accordingly, the General Plan includes a statement of population density (numbers of people) for the territory it covers. (See *Twain Harte, supra,* 138 Cal.App.3d at p. 699; see also *Camp v. Board of Supervisors* (1981) 123 Cal.App.3d 334, 350 [there must be a perceptible connection between density standards and locations within the jurisdiction].)

Government Code section 65302, subdivision (a) does not require a general plan's population density statement be "prescriptive," rather than "descriptive," as appellants

8

suggest. Rather, that section requires a statement of *recommended* densities, not binding or inflexible limits on density. (See *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 718, fn. 7 (*Sequoyah*) [map that is " 'largely illustrative in nature' " is a standard of population density under Government Code section 65302, subdivision (a), even though the City's approvals may occasionally deviate from details of the map].)

Moreover, respondents dispute appellants' claim that Table I-27 only describes existing densities. The averages in the table correspond to specific zoning designations and general locations throughout the City, as also identified in the table. Therefore, respondents maintain, geographic locations and the zoning designations throughout the City also signal the generally recommended population density. Further, the Housing Element contemplates that new housing will generally be constructed at densities similar to the surrounding development. Therefore, Table I-27 and Map I-2 also project the likely future densities throughout the City. (See Housing Element Part I, pp. 92-93 [discussion projecting future residential development on in-fill sites at lower densities in neighborhoods characterized by single-family homes, and higher densities closer to downtown and in the City's mixed-use districts].) We conclude the General Plan adequately states population densities.

**2. *Building intensity.*** Terming the General Plan building intensity standards "marginally better" than its "population density" standards, appellants argue that the Urban Design Element inclusion of a citywide map of maximum building heights, and its map identifying building bulk standards are insufficient, as the standards do not contain the usual measure of FIR (floor intensity ratios) and bulk limits are set only for parts of a building exceeding a certain height.[1]

---

[1] Policy 3.6 of the Urban Design Element states in pertinent part that "extremes in bulk should be avoided by establishment of maximum horizontal dimensions for new construction above the prevailing height of development in each area of the city. [¶] . . . [¶] The guidelines for building bulk expressed in this Plan are intended to form an urban design basis for such regulation. *These guidelines favor relatively slender construction above prevailing heights, but would not limit the horizontal dimensions of buildings*

The Urban Design Element includes a map of the various permitted building heights citywide and a separate map addressing building bulk. (Land Use Index, pp. 108-109, Figures VI.4, "Urban Design Guidelines for Height of Buildings" and VI.5 "Urban Design Guidelines for Bulk of Buildings Map.") The bulk map establishes maximum dimensions of buildings *above specified heights*. These height and size limitations help define the envelope or "intensity" of buildings throughout the City. They include standards for the Parkmerced site.

Building intensity for the site is further regulated through the project's General Plan amendment and SUD. Project approvals amend Height Map 4 to establish a boundary around the Parkmerced site and replace existing height regulations with a notation to " 'See Parkmerced Special Use District, Section 249.64 of the Planning Code and Sectional Map HT13 of the Zoning Maps.' " The SUD, in turn, establishes building height and bulk for the site through amendments to the applicable zoning height map and a bulk table. The ordinance establishing the Parkmerced SUD also contained amendments to the Planning Code identifying permitted uses in each of the newly established Parkmerced classes of use districts, as well as prohibited uses in the SUD as a whole.

The standards for building heights and the bulk limits for buildings above specified heights are precisely the sorts of standards called for in *Twain Harte, supra,* 138 Cal.App.3d at page 699 (standards might include "restrictions such as height or size limitations, restrictions on types of buildings or uses to be permitted within a designated area"). The building intensity requirement of Government Code section 65302, subdivision (a) was satisfied here.

_____

*below those heights*. Generally speaking, the guidelines would not limit the total floor space that could be built, but would help to shape it to avoid negative external effects. If two or more towers are to be built on a single property, their total effect should be considered and a significant separation should be required between them. The precise form of the building or buildings would in large measure be left to the individual developer and his architects under these guidelines." (Policy 3.6, italics added.)

**3.** *Correlation of circulation element with changes in population density and building intensity.* Appellants suggest the General Plan is also deficient in that the Transportation Element is not correlated with the Land Use Element, as required by Government Code section 65302, subdivision (b). In a single paragraph in their opening brief, appellants argue that without adequate building intensity standards, the General Plan "cannot predict the increased transportation demand associated with future development and adjust the circulation element accordingly." As we have determined building intensity standards were adequate, we reject this claim.

Furthermore, as recognized in *Federation of Hillside & Canyon Assns. v. City of Los Angeles, supra,* 126 Cal.App.4th at page 1196, "the internal consistency and correlation requirements do not require a city or county to limit population growth or provide traffic management measures to ensure that its transportation infrastructure can accommodate future population growth. The Planning and Zoning Law (Gov. Code, § 65000 et seq.) does not require a city or county to avoid adverse impacts on transportation. Rather, the city has broad discretion to weigh and balance competing interests in formulating development policies, and a court cannot review the wisdom of those decisions under the guise of reviewing a general plan's internal consistency and correlation. [Citation.]"

As respondents point out, the Project Approvals reflect the City's decision to limit parking and roadway capacity in areas well served by transit. We do not second guess such a policy choice.

## II. Project Consistency with the General Plan

As is often the case, the standard of review and the degree of deference this court is to apply to the decision of the City is determinative of many of the issues presented. Appellants, joined by amici curiae Sierra Club and California Preservation Foundation, contend that deference to City's interpretation of the priority policies of the General Plan was unwarranted, because the priority policies had been enacted via a citizen's initiative, Measure M, rather than authored by the City itself. Appellants and amici argue that the initiative must be interpreted to effectuate the intent of the voters and that the City's

11

intent and its interpretation of the meaning of the policies are irrelevant and entitled to little, if any, deference.

Appellants and amici further maintain that the priority policies must be strictly construed, as Measure M requires that the City make findings of consistency with those priority policies for all future projects, and that the plain language of Measure M requires a *specific* finding of consistency with each and every priority policy identified therein. Consequently, appellants and amici assert that the consistency findings here were inadequate, insofar as they were based on determinations that the project was generally compatible with the priority policies or that "on balance" the project will further the priority policies and not obstruct their attainment. We disagree.

## A. Deference to the City's Interpretation of the General Plan Priority Policies

As stated by the Sixth Appellate District in *Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1562-1563 (*Pfeiffer*): "Our evaluation of appellants' contention is governed by well established standards." " ' " 'An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment.' [Citation.]" [Citation.] State law does not require perfect conformity between a proposed project and the applicable general plan. . . . [Citations.]' (*Friends of Lagoon Valley, supra,* 154 Cal.App.4th at p. 817.) In other words, 'it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan. . . . It is enough that the proposed project will be compatible with the objectives, policies, general land uses and programs specified in the applicable plan. [Citations.]' (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1510-1511 [(*Sierra Club*)].)" (*Pfeiffer*, at pp. 1562-1563.)

We addressed the applicable standard of review—abuse of discretion—more than two decades ago in *Sequoyah*, *supra*, 23 Cal.App.4th at page 717: "The city council's determination that the . . . project is consistent with the [city's general plan] comes to this court with a strong presumption of regularity. [Citation.] To overcome that presumption, an abuse of discretion must be shown. (Code Civ. Proc., § 1094.5 [citation].) An abuse

12

of discretion is established only if the city council has not proceeded in a manner required by law, its decision is not supported by findings, or the findings are not supported by substantial evidence. (Code Civ. Proc., § 1094.5, subd. (b).) We may neither substitute our view for that of the city council, nor reweigh conflicting evidence presented to that body. [Citation.]" (Accord, e.g., *Pfeiffer, supra,* 200 Cal.App.4th at p. 1563 [according "great deference" to the agency's consistency determination]; *Friends of Lagoon Valley, supra,* 154 Cal.App.4th at p. 816; *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782 (*Endangered Habitats*); *Sierra Club*, *supra*, 121 Cal.App.4th at pp. 1509-1510.)

Even those cases relied upon by appellants for the proposition that the priority policies must be strictly construed recognize and apply the abuse of discretion standard of review. *Endangered Habitats, supra,* 131 Cal.App.4th 777, agreed that appellate courts "review decisions regarding consistency with a general plan under the arbitrary and capricious standard. These are quasi-legislative acts reviewed by ordinary mandamus, and the inquiry is whether the decision is arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair. [Citations.] Under this standard, we defer to an agency's factual finding of consistency unless no reasonable person could have reached the same conclusion on the evidence before it. [Citation.]" (*Id.* at p. 782.) Similarly, *Families Unafraid to Uphold Rural El Dorado County v. El Dorado County Board of Supervisors* (1998) 62 Cal.App.4th 1332 (*FUTURE*), also acknowledged: "The Board's determination that [the project] is consistent with the Draft General Plan carries a strong presumption of regularity. (*Sequoyah, supra,* 23 Cal.App.4th at p. 717.) This determination can be overturned only if the Board abused its discretion—that is, did not proceed legally, or if the determination is not supported by findings, or if the findings are not supported by substantial evidence. (*Ibid.*) As for this substantial evidence prong, it has been said that a determination of general plan consistency will be reversed only if, based on the evidence before the local governing body, '. . . a reasonable person could not have reached the same conclusion.' [Citation.]" (*Id.* at p. 1338.)

13

No case cited by appellants or found by us refuses to apply this deferential standard to the determination by a local agency that a particular project was consistent with its general plan.

Appellants and amici argue that the reason for deference to the local legislative body is absent where, as here, the amendment to the General Plan that set forth the priority policies was not proposed by City, but was the result of an initiative adopted by the voters over opposition of many members of the Board. It is true that many cases explain that reviewing courts accord great deference to the agency's determination " 'because the body which adopted the General Plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citation.]' " (*Pfeiffer, supra,* 200 Cal.App.4th at p. 1563; see, e.g., *Friends of Lagoon Valley, supra,* 154 Cal.App.4th at p. 816; *Sierra Club*, *supra*, 121 Cal.App.4th at p. 1509; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142 (*Save Our Peninsula*).)

However, the Board's role in implementing the General Plan, including its discretion to determine whether proposed projects are consistent with the General Plan, is at least as important. The above cases also recognize that " '[b]ecause policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.]' " (*Pfeiffer, supra,* 200 Cal.App.4th at p. 1563; *Sierra Club, supra,* 121 Cal.App.4th at pp. 1509-1510; *Save our Peninsula*, *supra*, 87 Cal.App.4th at p. 142.) Such deference to the actions of the legislative body stems from well-settled principles of court respect for the separation of powers. (See *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 572 (*Western States*) ["[E]xcessive judicial interference with the [agency's] quasi-legislative actions would conflict with the well-settled principle that the legislative branch is entitled to deference from the courts because of the constitutional separation of powers. (Cal. Const., art. III, § 3; see [citations])"].) Furthermore, the agency's decisions regarding project consistency with a general plan are reviewed by ordinary

14

mandamus. The inquiry in such cases is "whether the decision is arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair. [Citations.]" (*Endangered Habitats, supra,* 131 Cal.App.4th at p. 782; cf., Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2013) ¶ 8:128.2, p. 8-90 [EIR determinations upheld if supported by substantial evidence].)

Nor do we find persuasive the claims of appellants and amici that policy reasons supporting liberal interpretation of citizens' initiative measures suggest affording less deference to the City's consistency findings here. Unlike *Perry v. Brown* (2011) 52 Cal.4th 1116, 1165, holding that sponsors of citizens' initiatives must be allowed to defend their validity, this case does not involve a challenge to the *validity* of a citizen's initiative. Rather, it is a challenge to the City's *application* of the General Plan and, specifically, to the City's interpretation and application of the priority policies adopted by Proposition M and found today in section 101.1(a) of the City's Planning Code. The same rules of construction that apply to other amendments to the Planning Code or to the General Plan apply here. "Once an initiative measure has been approved by the requisite vote of electors in an election, . . . the measure becomes a duly enacted constitutional amendment or statute." (*Perry,* at p. 1147.) As our Supreme Court has observed, " 'Although the initiative power must be construed liberally to promote the democratic process [citation] when utilized to enact statutes, those statutes are subject to the same constitutional limitations and rules of construction as are other statutes.' (*Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 675.) The same is true when a local initiative is at issue." (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 540.)

Any other conclusion would undermine the well-established limited role of judicial review in these types of cases and could lead to unworkable results, such as requiring application of *different* standards of review to consistency determinations in the

same proceeding where some General Plan policies were adopted by initiative and others by the agency.[2]

## B. Priority Policies Need Not be Strictly Construed

Relying upon *Endangered Habitats, supra,* 131 Cal.App.4th 777 and *FUTURE, supra,* 62 Cal.App.4th 1332, appellants and amici argue that the priority policies of the General Plan were fundamental, mandatory and clear. Consequently, they contend, project approval required findings that the project complied with each and every one of the strictly construed priority policies and the Board was not permitted to weigh and balance the various policies when considering project compliance. Again, we disagree.

When we apply the abuse of discretion standard of review, " 'the nature of the policy and the nature of the inconsistency are critical factors to consider.' (*FUTURE*, *supra*, 62 Cal.App.4th at p. 1341.) In addition, general consistencies with plan policies cannot overcome 'specific, mandatory and fundamental inconsistencies' with plan

---

[2] Respondents contend Proposition M was not a pure citizen's initiative, as four members of the Board of Supervisors acted to put Proposition M on the ballot. The parties disagree whether such act was "ministerial" or done independently by the members in accordance with the San Francisco Charter. Such dispute only further supports our view that the standard of review for consistency determinations should not hinge on the method by which a general plan was adopted or amended.

We do not agree with amici's argument based upon *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 (*Yamaha*), that less judicial deference should be afforded to the City's interpretation of its General Plan in this case, as the standard of review is "fundamentally *situational.*" (*Id.* at p. 12.) The *situation* here does not change based on the author of the relevant part of the general plan any more than changing membership in the agency that adopts a general plan would result in a changing standard of review. Further, we observe that *Yamaha* was cited in *San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, as authority for application of the traditional, highly deferential standard of review in a challenge to a project's compliance and consistency with the City's General Plan: "The inquiry for the issuance of a writ of administrative mandamus is whether the agency in question prejudicially abused its discretion; that is, whether the agency action was arbitrary, capricious, in excess of its jurisdiction, entirely lacking in evidentiary support, or without reasonable or rational basis as a matter of law. (Code Civ. Proc., § 1094.5, subds. (b), (c); *Yamaha*[, *supra,*] 19 Cal.4th [at pp.] 10-12; [citations].)" (*Id.* at pp. 673-674.)

policies. (*Id*. at p. 1342.)" (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 239.)

As we recognized in *Sequoyah, supra,* 23 Cal.App.4th 704, "[N]o project could completely satisfy every policy stated in the [general plan], and . . . state law does not impose such a requirement. [Citations.] A general plan must try to accommodate a wide range of competing interests—including those of developers, neighboring homeowners, prospective homebuyers, environmentalists, current and prospective business owners, jobseekers, taxpayers, and providers and recipients of all types of city-provided services—and to present a clear and comprehensive set of principles to guide development decisions. Once a general plan is in place, it is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micromanage these development decisions. Our function is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the city officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence. [Citations.]" (*Id.* at pp. 719-720; accord, *Pfeiffer, supra,* 200 Cal.App.4th at p. 1563; *Sierra Club, supra,* 121 Cal.App.4th at pp. 1509-1510.)

In *Endangered Habitats, supra,* 131 Cal.App.4th 777, and *FUTURE, supra,* 62 Cal.App.4th 1332, appellate courts held the findings of consistency made by the respective counties were unsupported by substantial evidence (*FUTURE,* at p. 1342) and that "no reasonable person could have made the consistency finding on the record" (*Endangered Habitats,* at p. 789.) In each case, the appellate court determined the land use project at issue to be inconsistent with very *specific* and mandatory policies of the applicable general plan. (*Endangered Habitats,* at pp. 785-786, 789; *FUTURE,* at p. 1342.)

As described by *Friends of Lagoon Valley, supra,* 154 Cal.App.4th at page 819, "the general plan in *Endangered Habitats*[, *supra,* 131 Cal.App.4th 777,] required the maintenance of specific levels of service at certain intersections as computed using a

17

specific methodology.[3] (*Id*. at pp. 782-783.) Although an EIR determined cumulative traffic impacts were not significant under a different methodology, the court remarked this fact was 'of no import' given the unambiguous requirements of the general plan. (*Id*. at p. 783.)" The traffic level service policy, by establishing a particular performance standard to be evaluated by a particular methodology was "mandatory" and "clear," such that the project that could not meet the performance standard under the required methodology, was inconsistent with the general plan. (*Endangered Habitats,* at pp. 782-783.) Furthermore, the general plan at issue in *Endangered Habitats* explicitly did not allow balancing of certain identified policies. Rather, it mandated compliance with a specific plan in order to maintain a buffer between urban development and a national forest. The specific plan distinguished between mandatory and permissive provisions and a consistency checklist explained that " ' "shall" indicates a mandatory [r]egulation to which there are no exceptions, while "should" indicates a non-mandatory [g]uideline.' " (*Id*. at pp. 785-786.) The *Endangered Habitats* court concluded that the specific plan amendment allowing the specific plan regulations to be balanced was in direct conflict with the general plan policy that new development must comply with *all* specific plan policies. (*Id*. at p. 787.) The balancing provision of the amendment was held to be inconsistent with the general plan and no reasonable person could find it consistent. (*Id*. at p. 788.)

---

**3** In *Endangered Habitats, supra,* 131 Cal.App.4th 777, "A 'traffic level of service policy' addresses the need for highway improvements when development increases traffic. County policy is that improvements must be made within a stated time after issuance of various permits so as to achieve level of service (LOS) D at intersections, and LOS C on Santiago Canyon Road. Here is the relevant language: 'LOS C shall . . . be maintained on Santiago Canyon Road links until such time as uninterrupted segments of roadway (i.e., no major intersections) are reduced to less than three miles.' This policy requires compliance to be evaluated according to the county's Transportation Implementation Manual, which in turn provides that traffic analysis on Santiago Canyon Road 'shall' use the methods described in the highway Capacity Manual (HCM)." (*Id*. at pp. 782-783.)

Similarly, the general plan in *FUTURE, supra,* 62 Cal.App.4th 1332, specified without exception that the designation " 'low density residential' " would be restricted to certain areas. The project proposed to develop " 'low density residential' " in another area. It was "readily apparent" the project directly conflicted with a mandatory policy set forth in the general plan. (*Id.* at pp. 1340-1341.) The appellate court held there was no substantial evidence supporting the county's implied finding of consistency, concluding that "no reasonable person, on the evidence before the Board, could conclude otherwise." (*Id.* at p. 1341; see also, *Sierra Club*, *supra*, 121 Cal.App.4th at p. 1511.)

As stated above, the priority policies adopted by Measure M are found in section 101.1 of the City's Planning Code, which provides in relevant part:

"SECTION 101.1. MASTER PLAN CONSISTENCY AND IMPLEMENTATION

"(a) The Master Plan shall be an integrated, internally consistent and compatible statement of policies for San Francisco. To fulfill this requirement, after extensive public participation and hearings, the City Planning Commission shall in one action amend the Master Plan by January 1, 1988.

"(b) The following Priority Policies are hereby established. They shall be included in the preamble to the Master Plan and shall be the basis upon which inconsistencies in the Master Plan are resolved:

"1. That existing neighborhood-serving retail uses be preserved and enhanced and future opportunities for resident employment in and ownership of such business enhanced;

"2. That existing housing and neighborhood character be conserved and protected in order to preserve the cultural and economic diversity of our neighborhoods;

"3. That the City's supply of affordable housing be preserved and enhanced;

"4. That commuter traffic not impede Muni transit service or overburden our streets or neighborhood parking.

19

"5. That a diverse economic base be maintained by protecting our industrial and service sectors from displacement due to commercial office development, and that future opportunities for resident employment and ownership in these sectors be enhanced;

"6. That the City achieve the greatest possible preparedness to protect against injury and loss of life in an earthquake;

"7. That landmarks and historic buildings be preserved; and,

"8. That our parks and open space and their access to sunlight and vistas be protected from development."

Subdivisions (c) and (d) of section 101.1 provide that the City may not adopt any zoning ordinance or development agreement authorized pursuant to Government Code section 65865, unless, "prior to that adoption it has specifically found that the ordinance or development agreement is consistent with" the priority policies and the Master Plan. Subdivision (e) of section 101.1 provides that similar consistency findings "shall" be made by City before "issuing a permit for any project or adopting any legislation which requires an initial study under [CEQA], and prior to issuing a permit for any demolition, conversion or change of use, and prior to taking any action which requires a finding of consistency with the Master Plan."

The language of section 101.1(b) of the City's Planning Code that "the Priority Policies are to be the basis upon which inconsistencies in the Master Plan are resolved," does not remotely provide the type of specificity and clarity that is found in the general plan policies of either *FUTURE, supra,* 62 Cal.App.4th 1332 or *Endangered Habitats, supra,* 131 Cal.App.4th 777. A reasonable person could conclude that such language allows the City to weigh and balance the priority policies and to construe them in light of the purposes of the General Plan. As for the specific priority policies themselves, the plain language of these policies lack the type of directive courts use to determine whether a policy is mandatory—use of words such as "must" or "shall." Our reading of the priority policies here persuades us they are neither "mandatory" nor "clear," and the project does not directly conflict with them, unlike the plans in *FUTURE* and *Endangered Habitats*, where the project in each case directly conflicted with one or more

20

specific and mandatory policies set forth in the general plans to the degree that no reasonable person could conclude they were consistent. While the City Planning Code requires that procedurally, a project must be found consistent with the policies, the policies themselves contain no objective standards, but only subjective standards that neither prohibit any particular development or type of development nor command any particular outcome.

Nearly 30 years ago, immediately after passage of Proposition M, the San Francisco City Attorney issued an analysis of that measure, observing that, "[t]here is no evidence that in passing Proposition M, the voters intended to alter the City's practice of determining consistency by considering the relevant policies as a whole" and concluding that, "the consistency requirement of Proposition M calls for a balancing of the eight Priority Policies rather than strict compliance with each and every one. Subject to the other provisions of Proposition M and the Code, the City Planning Commission [or other entity required to make the consistency finding] may approve each project . . . if, after considering all aspects of the project, the Commission concludes that approval of the project would further the Priority Policies and not obstruct their attainment. If a particular action would advance some Policies while frustrating others, a finding of consistency would be proper only if the Commission concludes that the benefits in furthering some of the Policies outweigh the harm in impeding others." (S.F. City Atty., Opn. No. 86-17 (Dec. 16, 1986) pp. 15-16, fn. omitted.) The opinion pointed out that "[t]here is no evidence that in passing Proposition M, the voters intended to alter the City's practice of determining consistency by considering the relevant policies as a whole"—an approach approved by this division in *Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco* (1980) 106 Cal.App.3d 893, 915-916. (S.F. City Atty. Opn. No. 86-17, pp. 14-15.) Furthermore, applying this standard to Proposition M comports with the settled rule that where legislation is ambiguous, courts should give it " 'a reasonable and common sense construction in accordance with the apparent purpose and intention of the lawmakers—one that is practical rather than technical and that will lead to a wise policy rather than mischief or

21

absurdity [citation].' [Citation.]" (*County of Orange v. Barratt American, Inc.* (2007) 150 Cal.App.4th 420, 432- 433.) As the City Attorney observed at the time, "Construing proposition M to require that every action be consistent with each of the eight Priority Policies would lead to the extreme result of blocking most planning actions." (S.F. City Atty. Opn. No. 86-17, p. 15.) In two somewhat prescient examples, the City Attorney, pointed out that priority policy No. 3, encouraging affordable housing projects, would likely violate priority policies Nos. 1 and 2, if the projects replaced existing housing or existing retail businesses and that the priority policy of preserving existing affordable housing (priority policy No. 3) could easily conflict with the priority policy of achieving the greatest possible earthquake preparedness (priority policy No. 6). (*Ibid.*) We agree with the City Attorney's long-settled construction of this legislation and with its observation that "requiring perfect consistency with each of the Priority Policies could prevent many, if not all, affordable housing projects." (*Ibid.*)

## C. Priority Policy Consistency Determination

Appellant challenges the City's findings that the project and its accompanying approvals were consistent with priority policies Nos. 2, 4, 6, 7 and 8. Amici join appellants in arguing that the project is inconsistent with policies Nos. 2 and 7. In finding that the development agreement was in conformity with the General Plan, as amended, and the eight priority policies of Planning Code section 101.1, the Board adopted and incorporated by reference the findings made by the Planning Commission. The Planning Commission had found that the development agreement and related approval actions were, "on balance," consistent with the General Plan and with the priority policies of Planning Code section 101.1(b), stating its reasons, in relevant part as follows:

[Priority Policy No. 2] "The existing housing and neighborhood character will be conserved and protected in order to preserve the cultural and economic diversity of our neighborhoods:

"The proposed Project would preserve the existing diversity and character of Parkmerced by maintaining the same number of rent controlled units (3,221 rent controlled units) that currently exist at Parkmerced. The Project would accomplish this

22

by conserving 1,683 existing rent controlled apartments, which would remain subject to the Rent Stabilization Ordinance, and replacing all 1,538 existing rent controlled apartments that would be demolished by the Project with a new unit that would be subject to the same protections as contained in the Rent Stabilization Ordinance for the life of the building.  In addition, under the proposed Project, residents of buildings proposed for demolition would be given the opportunity to relocate to such replacement units in a new building and would be assessed the same rent as their previous unit.  The Project would also enhance the diversity of Parkmerced by constructing a large number of new BMR [below market rate] affordable units.  Currently, Parkmerced has no BMR units.  Further, the proposed Project would enhance the character of the Parkmerced neighborhood by establishing a social and commercial core, improving pedestrian accessibility, and creating open space and recreational opportunities.”

"[Priority Policy No. 4]  The commuter traffic will not impede MUNI transit service or overburden our streets or neighborhood parking:

"The proposed Project would enhance MUNI transit service by re-routing the MUNI M-Oceanview light-rail line through the Project Site, creating two new stations and relocating the existing Parkmerced/SFSU station.  These improvements would alleviate the overcrowding issues at the existing Parkmerced/SFSU station and improve the connection to SFSU by requiring riders to cross Holloway Avenue as opposed to Nineteenth Avenue.  The realignment would also reduce the walking distance to transit for residents of Parkmerced, thereby encouraging the use of public transportation.  In addition, the proposed roadway re-alignments would ease the burden on City streets in the Parkmerced area by improving traffic flow.  Finally, the proposed Project would add approximately 90 on-street and 6,252 off-street parking spaces, ensuring that residents of the proposed Project do not rely on parking in the adjoining neighborhoods.

"[Priority Policy No. 6]  The City will achieve the greatest possible preparedness to protect against injury and loss of life in an earthquake.

"The proposed Project would help the City achieve the greatest possible preparedness to protect against injury and loss of life in an earthquake because the new

buildings would be constructed in accordance with all applicable building codes and regulations with regard to seismic safety.

"[Priority Policy No. 7]  That landmark and historic buildings will be preserved:

"The proposed Project would not adversely impact any City landmarks because there are no City-designated landmarks on the Project Site.  Although none of the buildings on the Project Site are designated City landmarks, as mitigation for the Proposed Project's impacts to historic resources under [CEQA], the Project Sponsor will prepare documentation of the site based on the National Park Service's Historic American Building Survey/Historic American Engineering Record Historical Report Guidelines and provide a permanent display of interpretative materials concerning the history of the original Parkmerced complex.

"[Priority Policy No. 8]  "Parks and open space and their access to sunlight and vistas will be protected from development:

"The proposed Project would provide 68 acres of open space in a network of publically accessible neighborhood parks, athletic fields, public plazas, greenways and a farm.  The Project would provide significant additional open space in the form of private or semi-private open space areas such as centralized outdoor courtyards, roof decks, and balconies.  These private and semi-private open spaces would be required within the development of each residential building within Parkmerced.  The parks and open space would be more accessible and usable than the current open spaces.  Parks and open space within, and in the vicinity of, the proposed Project would continue to receive a substantial amount of sunlight during the day when use is at its highest rate.  Existing coastal views from parks located to the east and north of the Project Site would be maintained with implementation of the proposed Project."

The priority policy consistency findings made by the City are supported by the reasons given by the Planning Commission and are supported by the record.  We cannot conclude that no reasonable person would make such determinations.  Appellants' and amicis' challenges to these findings are based upon their rigid reading of the priority

24

policies and their refusal to recognize the general rule giving discretion to the Board to balance the numerous General Plan priorities.

## D. Project Consistency with other General Plan Policies

Appellants contend that other policies in the General Plan echo the priority policies and that project approvals are also inconsistent with those policies.[4] Having rejected appellants' premise—that the project and Project Approvals were inconsistent with the priority policies—we also reject their conclusion. Nevertheless, we briefly address the claims of inconsistency.

1. *Housing element policy 3.6 consistency determination.* Housing element policy 3.6 states: "Preserve Landmark and Historic Residential Buildings." This policy is by its terms more narrow than priority policy No. 7, as it is limited to historic *residential* buildings. Parkmerced does not contain any landmark or historic *buildings*, residential or otherwise. A reasonable person could conclude the project and project approvals were not inconsistent with this general plan element.

2. *Community Safety Element Policy 2.11 regarding hazards from gas lines.* Appellants contend Community Safety Element Policy 2.11 which states "reduce hazards from gas fired appliances and gas lines" is similar to priority policy No. 6. Appellants argue the project site is located "very close to major PG&E gas pipelines" and that the "Planning Department attempted to belittle the risk involved using data . . . that antedated the San Bruno [pipeline] explosion of the previous fall." Appellants urge the data used by the City antedated the San Bruno explosion and they speculate that the project "will impede emergency response to a foreseeable catastrophic failure . . . ." The City consulted federal authorities as to the location of gas pipelines (noting that "the closest gas transmission line to the Project Site is PG&E's Line 109, which generally follows

---

[4] Appellants appear to have reversed the order of priority policies Nos. 6 and 7 in arguing that other policies, analogous to priority policies, were violated. We address the issue as appellants appear to have intended, pairing housing element policy 3.6, relating to landmark and historic residential buildings with priority policy No. 7 (landmark and historic building preservation) and community safety element policy 2.11 with priority policy No. 6 (earthquake preparedness).

Alemany Boulevard," outside project boundaries) and as to the risk of gas line explosions, finding them "rare." The City's risk assessment *did* take into consideration the San Bruno incident.[5] The City's reliance on building codes and regulations to assist in its determination that a project will reduce potential hazards was proper. (See *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 904 [compliance with building codes and the other regulatory provisions, in conjunction with a detailed geotechnical investigation, provided substantial evidence that the mitigation measures would reduce seismic impacts to a less than significant level].) Also relevant is the City's response to the earthquake preparedness priority policy No. 6, that "new buildings would be constructed with all applicable building codes and regulations with regard to seismic safety," including recommendations from the geologic, geotechnical and seismic study conducted for the project in May 2008. The City determined appellants' argument was "speculative" as it had been presented with no data or evidence that PG&E pipelines in the vicinity of the project posed a hazard to residents or visitors that would result from implementation of the proposed project.

We conclude a reasonable person could have reached the conclusion reached by City here that the project was consistent with community safety element policy 2.11.

**E. Project Consistency With Numerous Other Additional General Plan Objectives and Policies**

As in *Sequoyah, supra,* 23 Cal.App.4th 704, appellants here challenge the project on the basis of seven of the numerous policies and objectives encompassed in the General

---

[5] "In California, the 10-year average (2001-2010) of significant incidents relating to gas distribution pipelines is 6 incidents, 0 fatalities, 1 injury, and $1,438,746 worth of property damage per year based across 102,659 miles of pipeline. The 10-year (2001-2010) average of significant incidents relating to gas transmission incidents is 2 incidents, 1 fatality, 5 injuries, and $1,240,998 in property per damage per year. This average, taken over a 10-year period, includes 1 fatality that occurred in 2003, and 8 fatalities that occurred in San Bruno in 2010. Furthermore, according to data from PHMSA, when incidents do occur, most injuries due to gas transmission pipeline incidents were to pipeline operator employees or operator contractors, and not to the general public in the vicinity of the pipeline." (FEIR Response to Comments No. 3.3.)

Plan (which City numbers at 78 or more). Given the standard of review here and the discretion vested in the City to weigh and balance General Plan policies in its determination whether the project is consistent with the General Plan (*id.* at p. 719), we would be hard pressed to overturn the City's determination in this case were we to find it unsupported with respect to a single policy. After identifying at least 78 objectives and policies in the Housing, Urban Design, and Transportation Elements with which the project is consistent, the City found that replacing the Parkmerced housing development, designed to separate land uses and rely extensively on automobile use, with a modern and sustainable development that will alleviate the City's housing shortage, promote transit use, and increase energy efficiency without displacing any tenant furthers the General Plan's purposes and is "on balance" consistent with the General Plan. Based on substantial evidence in the record, we conclude that a reasonable person could reach the same conclusion.

## III. CEQA

### A. CEQA Overview

"Among other requirements, an EIR must describe the proposed project and its environmental setting, state the objectives sought to be achieved, identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify and analyze alternatives to the project. ([Pub. Resources Code,] §§ 21100, subd. (b), 21151; Cal. Code Regs., tit. 14, §§ 15124, 15125, 15126.6.)[6] As our Supreme Court has . . . emphasized, 'The preparation and circulation of an EIR is more than a set of technical hurdles for agencies and developers to overcome. The EIR's

---

[6] Hereafter, all statutory references are to the Public Resources Code, unless otherwise indicated. All future references to Guidelines are to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) "developed by the Governor's Office of Planning and Research and adopted by the California Resources Agency. (§ 21083.) '[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA. [Citation.]' (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 (*Laurel Heights I*).)" (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 80, fn. 4 (*Communities*).)

function is to ensure that government officials who decide to build or approve a project do so with a full understanding of the environmental consequences and, equally important, that the public is assured those consequences have been taken into account. [Citation.] For the EIR to serve these goals it must present information in such a manner that the foreseeable impacts of pursuing the project can actually be understood and weighed, and the public must be given an adequate opportunity to comment on that presentation before the decision to go forward is made.' (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 449–450 [(*Vineyard*)].)" (*Communities*, *supra*, 184 Cal.App.4th at pp. 79-80.)

" 'In determining the adequacy of an EIR, the CEQA Guidelines look to whether the report provides decision makers with sufficient analysis to intelligently consider the environmental consequences of a project. ([Guidelines,] § 15151.) The CEQA Guidelines further provide that "the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . . The courts have [therefore] looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." ([Guidelines,] § 15151.)' [Citation.] The overriding issue on review is thus 'whether the [lead agency] reasonably and in good faith discussed [a project] in detail sufficient [to enable] the public to discern from the [EIR] the "analytic route the . . . agency traveled from evidence to action." [Citation.]' [Citation.]" (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 262.)

"In reviewing compliance with CEQA, we review the agency's action, not the trial court's decision. (*Vineyard . . . , supra,* 40 Cal.4th at p. 427.) In doing so, our 'inquiry "shall extend only to whether there was a prejudicial abuse of discretion." [Citation.]' Abuse of discretion is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' (§ 21168.5.) Substantial evidence in this context means 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' (Guidelines, § 15384, subd. (a).)" (*Communities*, *supra*, 184 Cal.App.4th at pp. 79-80.)

28

Plaintiffs assert numerous defects in City's CEQA review.

## B. Project Description

"An accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193[(*County of Inyo*)]; accord *Communities, supra,* 184 Cal.App.4th at p. 80; see Guidelines § 15124 (14 Cal. Code Regs. § 15124.[7]) "Without an accurate

---

[7] Guidelines section 15124, "Project Description" provides:

"The description of the project shall contain the following information but should not supply extensive detail beyond that needed for evaluation and review of the environmental impact.

"(a) The precise location and boundaries of the proposed project shall be shown on a detailed map, preferably topographic. The location of the project shall also appear on a regional map.

"(b) A statement of the objectives sought by the proposed project. A clearly written statement of objectives will help the lead agency develop a reasonable range of alternatives to evaluate in the EIR and will aid the decision makers in preparing findings or a statement of overriding considerations, if necessary. The statement of objectives should include the underlying purpose of the project.

"(c) A general description of the project's technical, economic, and environmental characteristics, considering the principal engineering proposals if any and supporting public service facilities.

"(d) A statement briefly describing the intended uses of the EIR.

"(1) This statement shall include, to the extent that the information is known to the lead agency,

"(A) A list of the agencies that are expected to use the EIR in their decision-making, and

"(B) A list of permits and other approvals required to implement the project.

"(C) A list of related environmental review and consultation requirements required by federal, state, or local laws, regulations, or policies. To the fullest extent possible, the lead agency should integrate CEQA review with these related environmental review and consultation requirements."

(2) If a public agency must make more than one decision on a project, all its decisions subject to CEQA should be listed, preferably in the order in which they will occur. On request, the Office of Planning and Research will provide assistance in identifying state permits for a project."

description on which to base the EIR's analysis, CEQA's objective of furthering public disclosure and informed environmental decision making would be stymied. A project description that omits integral components of the project may result in an EIR that fails to disclose all of the impacts of the project. [Citation.]" (1 Kostka & Zischke, Practice Under the California Environmental Quality Act (Cont.Ed.Bar 2d ed., March 2014 update) § 12.2, p. 12-3 (Kostka & Zischke).) An EIR project description must comply with various technical requirements and must also: (1) constitute an accurate description that does not minimize project impacts; (2) include discussion of reasonably foreseeable activities; and (3) be stable and consistent throughout the EIR. (*Id.* at § 12.2, pp. 12-2, 12-3.) At the same time, the project description "should not supply extensive detail beyond that needed for evaluation and review of the environmental impact. (Guidelines, § 15124.)

"The EIR's project description, and the accompanying analysis, must be consistent throughout the EIR. If the project description is inconsistent (e.g., if a project is described differently in different sections of the EIR), these shifts prevent the EIR from serving as a vehicle for intelligent public participation in the decision-making process. [Citation.]" (1 Kostka & Zischke, *supra,* § 12.11, pp. 12-16, 12-17, citing *County of Inyo, supra,* 71 Cal.App.3d at p. 193 [description was neither stable nor consistent where project was described first as increased groundwater pumping to provide additional water for city-owned lands in Inyo and Mono Counties; elsewhere as an expanded project to increased pumping as part of a larger operation of the Los Angeles aqueduct system; and finally as operation of the entire aqueduct system in an environmentally sensitive manner, including groundwater pumping to serve Inyo and Mono County city lands].)

The consistency requirement does not mean that the project cannot change as it proceeds throughout the CEQA review. (*County of Inyo, supra,* 71 Cal.3d at p. 199; e.g. *Western Placer Citizens for an Agr. and Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 898; 1 Kostka & Zischke, *supra,* § 12.11, p. 12-17.)

**1. *Project duration*.** Appellants here contend the project description "metamorphosed several times, both in terms of timing and in terms of what the project

30

included."  They first challenge the description of the project's duration, arguing it was ambiguous as having changed from the pre-EIR application which identified construction of new residences and a neighborhood core occurring "[o]ver a period of 15 to 30 years" to the DEIR and responses to comments that identified a duration of  "approximately 20 years," but also referenced a 30-year term for the development agreement and a pedestrian wind study that used a 30-year time frame.

CEQA does *not* require a project description to identify a specific completion date. (See Guidelines, § 15124.)  Rather, CEQA requires that the EIR contain "an accurate, stable and finite project description . . . ."  (*County of Inyo, supra,* 71 Cal.App.3d at p. 199.)  We agree that the significance of project impacts may vary depending upon the length and duration of the project.  However, there is no significant discrepancy in the length or duration of the project.

The EIR here consistently assumed that construction of the project would last for 20 years.  It used the 20-year estimate to analyze potential impacts that might be dependent on the duration of the project, including its analysis of priority policies, land use, aesthetics, population and housing, direct temporary population growth, transportation, noise, air quality, greenhouse gasses, recreation, utilities, public services, biological resources, geology, hydrology, and hazardous materials.  It used the 20-year duration in responding to comments.

The EIR also acknowledged the possibility that full development could take longer than 20 years.  However, it made the reasonable assumption of a 20-year construction period.  As explained in footnotes in the DEIR and the FEIR describing the phasing and construction of the project "over an approximately 20-year period":  "The Project Sponsor expects the phasing of the Proposed Project to occur over 20 years, but the full development could extend for a longer period.  Consequently, the [d]evelopment [a]greement would likely cover a 30-year projected buildout."  The FEIR also acknowledges that "[s]ince preparation of the NOP [Notice of Preparation] in May 2009, several modifications have been made to the Proposed Project.  Buildout of the Proposed Project has been reduced from 30 to 20 years."

31

The 30-year duration of the development agreement is not inconsistent with the EIR estimate that the project will take 20 years to complete. The 20-year project duration is a reasonable description of the length of time it will take to complete construction and development of the project and to facilitate a realistic evaluation of project impacts over that period for EIR purposes. The development agreement, on the other hand, is a contract between the City and real party in interest, the project sponsor, assuring that real party can proceed with the project in accordance with existing policies, rules and regulations, subject to project approval. (Gov. Code, § 65864, subd. (b); see also, *id.* §§ 65865.4, 65866.) This 30-year period provides added certainty that each side will obtain the negotiated benefits in the agreement regardless of any possible *delays* in project construction.

The wind study cited by appellants mentions that construction would take approximately 30 years. However, changes in the wind environment at the project site will not depend on the duration of the construction. Consequently, this discrepancy is irrelevant to the wind study.

Although appellants argue that emissions from construction activities would be more prolonged (though less intense) over a 30-year period than a 20-year period, they also acknowledge that the *EIR here assumes a more concentrated period of emissions* over the shorter period. The EIR makes the reasonable assumption that the construction period will be 20 years. It concludes that the project will create significant and unavoidable impacts associated with construction emissions. Such conclusion appears reasonable and appellants present no evidence that the possible extension of the construction period from 20 to 30 years due to delay or other causes would significantly vary that analysis.

"CEQA requires only that the agency 'use its best efforts to find out and disclose all that it reasonably can' (Guidelines, § 15144), and that the EIR display 'adequacy, completeness, and a good faith effort at full disclosure' (Guidelines, § 15151)." (*Planning and Conservation League v. Castaic Lake Water Agency* (2009) 180

Cal.App.4th 210, 253.)  The description of the project duration provided in the EIR satisfies these criteria.

**2.  *Eleven tower buildings located within the project site.***  Appellants contend the project description is ambiguous as to whether the project includes the 11 existing tower buildings.  Not so.  The EIR clearly states that the 11 tower buildings are located *within the project site* and *the project does not propose any modifications to them.*  (FEIR Part 1, § III.1 ["The existing on-site residential units are located in towers and 170 two-story buildings. . . .  About 1,683 of the existing apartments located in 11 tower buildings would be retained"]; FEIR Part 2, § V.N.12 ["The 11 existing towers on the Project Site are not proposed to be changed as a result of the Proposed Project; seismic hazards related to these buildings would remain as at present"].)

We conclude the EIR's project description is sufficiently "accurate, stable and finite" to "ensur[e] [that] the lead agency and the public have enough information to ascertain the project's environmentally significant effects, assess ways of mitigating them, and consider project alternatives . . . .' "  (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 533.)

## C.  Identification of Significant Impacts

Appellants argue that although the FEIR identified numerous significant and unavoidable impacts, it failed to identify *all* the project's significant impacts.  Specifically, appellants contend the FEIR failed to identify significant seismic safety, displacement, public safety, land use, and greenhouse gas production impacts.

The Guidelines require that "[a]n EIR shall identify and focus on the significant environmental effects of the proposed project.  In assessing the impact of a proposed project on the environment, the lead agency should normally limit its examination to changes in the existing physical conditions in the affected area as they exist at the time the notice of preparation is published . . . ."[8]

---

[8]  Guideline section 15126.2(a) also provides in relevant part that:

33

**1. *Seismic safety*.** The FEIR identified impacts based upon the seismic safety of new buildings proposed to be constructed as part of the project and found the impacts *not* significant.[9] With respect to the existing 11 towers, the FEIR acknowledged that strong ground shaking would affect them, stating: "Strong seismic ground shaking could occur at the Project Site during an earthquake on one of the nearby active faults such as the San Andreas and Hayward faults. Strong ground shaking would affect existing and new buildings on the Project Site. The 11 existing towers on the Project Site are not proposed

"The EIR shall also analyze any significant environmental effects the project might cause by bringing development and people into the area affected. For example, an EIR on a subdivision astride an active fault line should identify as a significant effect the seismic hazard to future occupants of the subdivision. The subdivision would have the effect of attracting people to the location and exposing them to the hazards found there." Similarly, the EIR should evaluate any potentially significant impacts of locating development in other areas susceptible to hazardous conditions (e.g., floodplains, coastlines, wildfire risk areas) as identified in authoritative hazard maps, risk assessments or in land use plans addressing such hazards areas. This provision of the Guidelines has been held to be inconsistent with provisions in the statute defining an environmental impact as a change in the physical environment affected by a proposed project (. . . §§ 21060.5, 21100) in *South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604, 1616 and *Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 474 (*Ballona*). As *Ballona* explained, "identifying the effects on the project and its users of locating the project in a particular environmental setting is neither consistent with CEQA's legislative purpose nor required by the CEQA statutes." (*Ballona*, at p. 474.) (See 1 Kostka & Zischke, *supra,* § 13.5, p. 13-7.)

This issue is now before the Supreme Court in *California Bldg. Industry Assn. v. BAAQMD* (S213478) (rehg. granted Nov. 26, 2013 ["[u]nder what circumstances, if any, does the [CEQA] require an analysis of how existing environmental conditions will impact future residents or users (receptors) of a proposed project"].)

[9] "New buildings at Parkmerced would be designed and constructed in accordance with the most up-to-date version of the San Francisco Building Code, which incorporates CBC requirements that specify procedures used to calculate seismic forces on structures during ground shaking and address them. . . . [¶] . . . [¶] Given compliance with the requirements of the San Francisco Building Code, including review and enforcement of geotechnical reports and review of building plans and site-specific soils report(s) by DBI in order to determine necessary engineering and design features, there would be no significant impacts related to seismic hazards. The exposure of people or structures to potential adverse effects due to seismic hazards would be less than significant. No mitigation is required."

to be changed as a result of the Proposed Project; seismic hazards related to these buildings would remain as at present."

Respondents maintain that the 11 existing towers are not part of the proposed project and their seismic safety would not be affected by it. They point out that "[t]he structural condition of these buildings (all of which meet current building code requirements) is an existing condition of the [p]roject." "The purpose of an EIR is to identify and discuss the impact of the proposed project on the existing environment." (*Watsonville Pilots Assn. v. City of Watsonville* (2010) 183 Cal.App.4th 1059, 1094 [rejecting a claim that the EIR must resolve an existing groundwater overdraft problem].) "Because the purpose of an EIR is to assess the project's effects on the existing environment, an EIR need not resolve existing environmental problems that will not be made worse by the project. [Citation.]" (1 Kostka & Zischke, *supra,* § 13.4, p. 13-6, citing *Watsonville Pilots.*)[10]

Appellants also contend that the EIR failed to disclose the cumulatively significant seismic impacts of leaving the towers unprotected in the midst of the project, arguing that after a future major earthquake they would need to be vacated and demolished. This, in turn, would lead to cumulatively significant displacement impacts for tower tenants and also cumulatively significant noise, air quality and toxics impacts associated with the tower demolition, both for remaining residents and the nearby community. Appellants point to no evidence in the record that construction elsewhere on the project site would decrease the safety of the 11 towers. Nor do the speculative scenarios posited by

---

[10] Compare with *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1167 ["Under CEQA, the range of alternatives that an EIR must study in detail is defined in relation to the adverse environmental impacts *of the proposed project*. An EIR must include a description of feasible project alternatives that would substantially lessen the project's significant environment effects. (Pub. Resources Code, § 21061; Cal. Code Regs., tit. 14, § 15126.6, subds. (d), (f).) The project's environmental effects, in turn, are determined by comparison with the existing 'baseline physical conditions.' (Cal. Code Regs., tit. 14, § 15125, subd. (a); see *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 952)"].)

appellants result from the project evaluated by the EIR.  (See Guidelines, § 15130, subd. (a)(1).[11])

Appellants' claim that demolition of the towers is the likely result of an earthquake is shear speculation and belied by the record.  Although the seismic conditions of the 11 towers remaining on the site were not affected by the proposed project, nevertheless, the FEIR included a summary of an analysis performed by qualified geotechnical consultants and structural engineers on existing conditions and how existing buildings on site performed during past seismic events and how they would be expected to perform in future events.  This September 2005 detailed analysis "concluded the towers were expected to perform adequately in a major earthquake from a life safety perspective, although significant structural and non-structural damage may occur, such as extensive cracking in the exterior and interior concrete walls, floor, and roof slabs. 'Performing adequately from a lifesafety perspective' indicates that the structures would not fail and occupants would be able to exit the structures.  The habitability of the structure after a major event would have to be separately assessed at that time."  Studies on damage and repairs after the Loma Prieta Earthquake indicated non-structural damage in many towers, but all were safe to occupy.  "The structural system worked as was expected and the present condition is completely stable."  Recommended repairs were effected and "[i]t was concluded that the repair work was satisfactory and the buildings had been restored to their pre-earthquake structural capacity."

*2. Displacement impacts.*  The FEIR finds:  "The Proposed Project would not displace substantial numbers of people and/or existing housing units . . . .  (*Less than Significant*)"

---

[11]  Guidelines section 15130(a)(1) provides:

"(1)  As defined in Section 15355, a cumulative impact consists of an impact which is created as a result of the combination of the project evaluated in the EIR together with other projects causing related impacts.  An EIR should not discuss impacts which do not result in part from the project evaluated in the EIR."

36

Appellants challenge the FEIR finding that the project will have no significant displacement impacts. They argue that tenant displacement will occur, despite the promise in the development agreement between City and real party that real party will provide replacement units of equivalent value to the Parkmerced townhouse unit tenants now occupy before their existing units are demolished. In fact, the development agreement states that the "Tenant Relocation Plan" to be submitted before the first building permit application for a replacement building will "ensure that Relocating Tenants within an existing block . . . shall be provided the opportunity to move to Replacement Units located on the same block, so that the Relocating Tenants can remain neighbors of the same block despite their relocation." Appellants contend that the development agreement's relocation plan provision is at best a mitigation measure that in City's estimate would reduce displacement impacts to less than significant. They argue that City made no findings to that effect, rendering the FEIR and CEQA findings defective.

The tenant relocation program is *not* a mitigation measure. Rather, it is one of the project sponsor's objectives and part of the project description as follows: "Protect and enhance the diversity of Parkmerced by protecting existing residents from displacement through a phasing plan designed to ensure that all existing residents will be able to remain at Parkmerced while having to relocate once only and into a new apartment, if necessary, and that this new apartment would be rented at the same rent-controlled rate as the resident's existing apartment prior to demolition (and also subject to the existing protections against rent increases of the San Francisco Rent Control Ordinance)." The FEIR further explains in "Project Characteristics" that, "Development of the Proposed Project would not displace existing Parkmerced residents. Residents of existing apartments that are proposed to be replaced would be provided with the opportunity to move to a new apartment before their unit is demolished. Construction and demolition would be phased to ensure that the residents of these units would be required to move into a new apartment only once. . . . Existing residents would not be required to move off site at any point during any phase of the Proposed Project."

37

The foregoing provides substantial evidence supporting the findings that the proposed project would not displace substantial numbers of people and the further finding that the proposed project would not physically disrupt or divide an established community, would not adversely affect the existing character of the vicinity, and that in this respect, it would have a less-than-significant impact on land use such that no mitigation was required.

Appellants further contend that the provision of the development agreement requiring real party to construct an equal number of equal value replacement units and to rent them at the same rent-controlled rents residents currently pay may be unlawful under the 1996 Costa-Hawkins Rental Housing Act (Civ. Code, §§ 1954.50-1954.535). That act includes a general prohibition against applying rent control to any units built subsequent to the act's enactment (Civ. Code, § 1954.52, subd. (a)), but excepts units "where the owner has otherwise agreed by contract with a public entity in consideration for a direct financial contribution or any other forms of assistance specified in Chapter 4.3 (commencing with Section 65915) of Division 1 of Title 7 of the Government Code [the state's density bonus housing law]." (Civ. Code, § 1954.52, subd. (b).) Appellants contend the City's position that this exception applies, despite the explicit reference in the statute to the state's density bonus housing law (Gov. Code, § 65915, et seq.), is "untested." The development agreement attempts to minimize any uncertainty by providing that in the event a court challenge invalidates the rent control provision, real party will provide the tenants with relocation assistance and damages that will compensate them for the loss.

Appellants speculate that any court that finds the rent control provisions unlawful, will also find the provisions compensating tenants for the loss of their rent-controlled units also void as against public policy.[12] Such speculation is not sufficient to counter the

---

[12] We note appellants' citation of *City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, in support of their claim that public policy would prevent enforcement of the compensation provision. The case is completely inapposite. In that wrongful death case, the court refused to read a waiver of liability for negligence to release liability for

reasonable determination of the lead agency that the exception applies, that the rent-control provision would survive legal challenge and, if not, that the damages provision would suffice to make tenants whole.

Furthermore, not only is this worst-case scenario (from the tenant's perspective) completely speculative, but it ignores the discussion of "assumptions" in *Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, in which appellants challenged the EIR "for making assumptions about the proposed project but failing to consider the environmental effects should any of those assumptions prove erroneous." (*Id.* at p. 1029.) The court rejected the claim stating: "Appellants are asking more of the EIR than is legally required. The 'assumptions' referred to are actually integral portions of the proposed project. *If they fail to become reality* (e.g., if the transportation corridor is not built), *we are dealing with a different project.* However, CEQA only requires that an EIR discuss '[t]he significant environmental effects of the proposed project.' (§ 21100, subd. (a), italics added.) The proposed project, which includes the transportation corridor, a preserved Greenbelt and 25 percent affordable housing, was evaluated in the EIR. CEQA requires nothing more." (*Id.* at p. 1030, italics added; accord *Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1036 ["Rather than demonstrating a lack of substantial evidence to support the baseline assumptions, . . . the opponents of the projects have mischaracterized the assumptions as something they are not. A public agency can make reasonable assumptions based on substantial evidence about future conditions without guaranteeing that those assumptions will remain true"].)

---

future gross negligence, where such a provision would be generally unenforceable and the agreement in the case did not specifically release such liability. In that context, the court said, "we conclude that public policy generally precludes enforcement of an agreement that would remove an obligation to adhere to even a *minimal* standard of care. Applying that general rule here, we hold that an agreement purporting to release liability for future gross negligence committed against a developmentally disabled child who participates in a recreational camp designed for the needs of such children violates public policy and is unenforceable. (*Id.* at p. 777, fn. omitted.)

The City in this case has made reasonable assumptions about the enforceability of the commitments made in the development agreement.

**3. *Public safety impact – gas pipelines.*** Appellants contend the EIR did not discuss the effects of a potential failure of the PG&E gas pipelines located a few blocks from the project site.[13]

As we have noted previously, numerous cases emphasize that "CEQA is implicated only by adverse *changes* in the environment." (*Baird v. County of Contra Costa* (1995) 32 Cal.App.4th 1464, 1468 ["[t]he purpose of CEQA is to protect the environment from proposed projects, not to protect proposed projects from the existing environment"]; accord *Ballona, supra,* 201 Cal.App.4th at p. 474 [holding an EIR is not required to identify or analyze "an effect on the project caused by the environment"]; *South Orange County Wastewater Authority v. City of Dana Point, supra,* 196 Cal.App.4th at p. 1618 ["[t]he effect with which SOCWA is concerned—odors from the sewage plant—is not an adverse change in any of the physical conditions within the area affected by the . . . project]."])

The location and existence of pipelines is a preexisting environmental condition that will not be impacted or altered because of the proposed project. Appellants do not argue the proposed project will have any adverse effect on the likelihood of a pipeline explosion. For this reason alone, substantial evidence supports the City's decision that pipeline explosions did not warrant discussion in the EIR.

The question whether this rule remains the law is currently on review before the California Supreme Court. (See *ante*, fn. 8 at pp. 33-34.) Therefore, in the alternative, we conclude that the City reasonably determined on the evidence before it that a gas pipeline explosion was extremely unlikely and hence, not reasonably foreseeable.

"An EIR is to disclose and analyze the direct and the reasonably foreseeable indirect *environmental* impacts of a proposed project if they are significant. (Guidelines,

_____

[13] According to the City, the closest gas transmission line is a PG&E pipeline that generally follows along Alemany Boulevard, which is about a quarter of a mile from the project site.

40

§§ 15126.2, 15064, subd. (d)(3).) . . . An impact 'which is speculative or unlikely to occur is not reasonably foreseeable.' (Guidelines, § 15064, subd. (d)(3).)" (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1182.) "[A]n EIR is not required to engage in speculation in order to analyze a 'worst case scenario.' " (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 373.)

Appellants provide no evidence undermining the City's determination that the potential for a gas pipeline explosion was not significant. We have addressed and rejected a similar claim in connection with appellants' challenge to the project's consistency with the community safety element of the General Plan. (*Ante*, Part II.D.(2), p. 25.) Based on the San Bruno pipeline explosion in 2010, appellants dispute the staff report that dismissed the risk of a pipeline rupture as speculative. In the appellants' appeal to the Board of Supervisors, the City responded that it had no data or evidence in its possession nor had it been presented with any data or evidence that PG&E pipelines in the project vicinity pose a hazard to existing residents, visitors or to new residents and visitors resulting from implementation of the project.[14] A public agency is not required to analyze impacts that are speculative, and "argument, speculation, unsubstantiated opinion" does not constitute substantial evidence for the purpose of determining whether an impact may be potentially significant. (§ 21082.2; Guidelines, § 15064, subd. (f)(5).) The data considered by the City covered a 10-year period from 2001-2010 and included the eight fatalities occurring in San Bruno in 2010. The City could reasonably determine on the evidence before it that significant gas pipeline incidents in California are "rare," such that impacts of such an unlikely event need not be addressed in the EIR.

---

[14] Appellants have tried to introduce evidence concerning the alleged risks from gas pipelines. We denied appellants' request for judicial notice, that improperly requested we consider evidence that had never been submitted to the City. The trial court also denied appellants' request for judicial notice and appellants have not argued such denial was improper. (*Western States, supra,* 9 Cal.4th at p. 574, fn. 4 [the only evidence relevant to the substantial evidence question under section 21168.5 is that which was before the agency at the time it made its decision].)

41

**4. *Land use impacts.*** Appellants challenge the FEIR and the City's findings that the project will have no significant land use impacts. Relying upon the checklist in Guidelines Appendix G, appellants assert this project will have significant land use impacts because it would physically divide an established community and conflict with an applicable land use plan, policy, or regulation adopted for the purpose of avoiding or mitigating an environmental effect.

Appellants contend there is no "guarantee" tenants will remain together in the replacement units, as assignment of replacements will be based on seniority of tenancy so that newer tenants would have less control. Additionally, appellants argue that there are no semi-private shared gardens or analogous amenity in the replacement units to promote a sense of community.

Substantial evidence supports the City's determination that the project would not physically divide an existing community. Certainly the project will not result in a physical barrier dividing the community. (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1419; *Cathay Mortuary, Inc. v. San Francisco Planning Com.* (1989) 207 Cal.App.3d 275, 280.) As recognized in *Gentry*, " 'A project will normally have a significant effect on the environment if it will . . . [¶] [d]isrupt or divide the physical arrangement of an established community.' (Guidelines, appen. G, subd. (u).) '[T]his guideline was intended to apply to projects, such as highway construction, that would constitute physical barriers dividing a community.' (*Cathay*, . . . at p. 280.)"

Appellant's second claim—that the project conflicts with an applicable land use plan, policy, or regulation adopted for the purpose of avoiding or mitigating an environmental effect—restates their claim that the project conflicts with or is inconsistent with the priority policies of Measure M. We have rejected that claim in the previous portion of this opinion and it founders here for the same reasons.

**5. *Greenhouse gas production impact.*** Appellants challenge the FEIR conclusion that the project will not cause a significant impact due to greenhouse gas (GHG) emissions. Their argument appears to be focused not upon the determinative question whether the finding of insignificance is supported by substantial evidence, but

42

rather, upon their claim that any increase in GHG emissions before 2020 must be *deemed* significant based on the target goals set forth in Assembly Bill No. 32 (AB 32). [15] [16] We disagree with appellants' approach and find that substantial evidence supports the City's finding of insignificance.

"When analyzing potentially cumulative GHG emission impacts, lead agencies should 'make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of [GHG] emissions resulting from a project.' (Guidelines, § 15064.4, subd. (a).) In assessing the significance of these emissions, the lead agency should consider the extent to which the project may affect emissions levels; whether emissions exceed an applicable threshold of significance; and whether the project complies with regulations or requirements adopted to implement statewide, regional, or local plans to reduce GHGs. (*Citizens for Responsible Equitable Environmental Development v. City of Chula Vista* (2011) 197 Cal.App.4th 327, 335-336, citing Guidelines, § 15064.4, subd. (b).)" (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 650.)

There is no requirement that a lead agency must find a project causes a significant impact simply because it may not result in decreased GHG emissions by 2020. (*Martin v. City and County of San Francisco* (2005) 135 Cal.App.4th 392, 402 ["CEQA is not to

---

[15] Appellants do not even refer to the substantial evidence standard as to this GHG issue until the last sentence of their closing brief, wherein they argue that "the EIR underestimated the Project's GHG emissions, especially in the pre-2020 period, and that the EIR's analysis of GHG emissions did not even address the stated threshold of whether the Project would impede achieving AB 32's standard for reducing GHG emissions by 2020. Together, these errors meant that the EIR's conclusion that the Project would not have a significant GHG production impact was not supported by substantial evidence."

[16] AB 32 is state legislation addressing GHG emissions the California Global Warming Solutions Act of 2006). (Health & Saf. Code, § 38500 et seq., enacted by Assem. Bill No. 32 (2005-2006 Reg. Sess.) (See *Friends of Oroville v. City of Oroville* (2013) 219 Cal.App.4th 832, 840.) As the EIR states, AB 32 establishes a state goal of reducing greenhouse gases to 1990 levels by the year 2020 (a reduction of approximately 25 percent from forecast emission levels) with further reduction to follow. (See also *Friends of Oroville,* at p. 840.)

43

be stretched beyond the 'reasonable scope of the statutory language.' [Citations.] CEQA is not to be interpreted 'in a manner which imposes procedural or substantive requirements beyond those explicitly stated in this division or in the state guidelines.' (Pub. Resources Code, § 21083.1)"].) Pursuant to Guidelines section 15064.4, the lead agency has discretion to select the model or methodology it considers most appropriate to quantify GHGs and retains the discretion to determine the threshold of significance that applies to the project.[17] (Guidelines, § 15064.4, subd. (a); *Citizens for Responsible Equitable Environmental Development v. City of Chula Vista, supra,* 197 Cal.App.4th at

---

[17] "**Determining the Significance of Impacts from Greenhouse Gas Emissions**.

"(a)  The determination of the significance of greenhouse gas emissions calls for a careful judgment by the lead agency consistent with the provisions in section 15064. A lead agency should make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of greenhouse gas emissions resulting from a project. A lead agency shall have discretion to determine, in the context of a particular project, whether to:

"(1)  Use a model or methodology to quantify greenhouse gas emissions resulting from a project, and which model or methodology to use. The lead agency has discretion to select the model or methodology it considers most appropriate provided it supports its decision with substantial evidence. The lead agency should explain the limitations of the particular model or methodology selected for use; and/or

"(2)  Rely on a qualitative analysis or performance based standards.

"(b) A lead agency should consider the following factors, among others, when assessing the significance of impacts from greenhouse gas emissions on the environment:

"(1)  The extent to which the project may increase or reduce greenhouse gas emissions as compared to the existing environmental setting;

"(2)  Whether the project emissions exceed a threshold of significance that the lead agency determines applies to the project.

"(3)  The extent to which the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation of greenhouse gas emissions. Such requirements must be adopted by the relevant public agency through a public review process and must reduce or mitigate the project's incremental contribution of greenhouse gas emissions. If there is substantial evidence that the possible effects of a particular project are still cumulatively considerable notwithstanding compliance with the adopted regulations or requirements, an EIR must be prepared for the project." (Guidelines, § 15064.4.)

p. 336 ["When assessing the significance of impacts from greenhouse gas emissions on the environment the lead agency should consider the extent the project may increase or reduce greenhouse gas emissions; whether the project emissions exceed a threshold of significance that the lead agency determines applies to the project; and the extent the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation of greenhouse gas emissions. (Guidelines, § 15064.4, subd. (b).) Thus, under the new guidelines, lead agencies are allowed to decide what threshold of significance it will apply to a project"].)

The EIR here acknowledged that construction of the project would result in an increase in the amount of GHG emissions—approximately four times the amount produced annually by the project's operation. It included both an extensive quantitative and qualitative analysis of the greenhouse gas emissions expected to result from the proposed project. The EIR evaluated the increased GHG activity onsite during the 20-year construction phase and the GHG contributed annually by the new residential, commercial and retail services upon completion. It also considered the "quantifiable effects of reduced motor vehicle trips and increased mass transit service . . . caused by the mixed-use and pedestrian-oriented nature of the Proposed Project." "As infill development, constructed in an urban area with high levels of transit access, the project would result in reducing regional vehicle trips and miles traveled." Further, the EIR observed, "the proposed project would also include the proposed Sustainability Plan and electricity, natural gas, and water conservation features to avoid GHG emissions that would otherwise be created by motor vehicle use, electricity consumption, and use of other resources including water."

The EIR also discussed City regulations aimed at further reduction of GHG and San Francisco's progress toward that end, stating that compliance with City's regulations and incorporation of various project design features as required by City regulations would reduce the project's overall GHG emissions and concluded, "Given that San Francisco has implemented binding and enforceable programs to reduce GHG emissions applicable to the proposed project and that San Francisco's sustainable policies have resulted in the

45

measured success of reduced GHG emissions levels, the proposed project's GHG emissions would result in a *less than significant impact*." (Italics added.) The foregoing provides substantial evidence supporting the EIR's conclusion that: "The Project would not result in a substantial contribution to global climate change by increasing GHG emissions in a manner that conflicts with the state goal of reducing GHG emissions in California to 1990 levels by 2020 (e.g., a substantial contribution to global climate change). (*Less than Significant*)."

The EIR also discussed AB 32 and the requirement that local governments "play the role of an 'essential partner' and to use local planning and permitting processes to achieve GHG reductions." After discussing City's implementation of many measures for increasing energy efficiency in new construction and other measures aimed at reduction of GHG emissions to 20 percent below 1990 levels by the year 2012, in furtherance of the state's efforts to reduce statewide GHG emissions as mandated by AB 32, the EIR concluded: "The proposed project would be required to comply with GHG reduction regulations as discussed above, as well as applicable AB 32 Scoping Plan measures that are ultimately adopted and become effective during implementation of proposed project. Given that the City has adopted numerous GHG reduction strategies recommended in the AB 32 Scoping Plan, that the City's GHG reduction strategy includes binding, enforceable measures to be applied to development projects, such as the proposed project, and that the City's GHG reduction strategy has produced measurable reductions in GHG emissions, the proposed project would not conflict with either the state or local GHG reduction strategies. In addition the proposed project would not conflict with any plans, policies, or regulations adopted for the purpose of reducing GHG emissions. Therefore, the proposed project would have a less than significant impact with respect to GHG emissions. No mitigation is required."

The EIR anticipated the adoption by the Bay Area Air Quality Management District (BAAQMD) of thresholds of significance for GHG emissions, by analyzing the project operational GHG emissions under the proposed efficiency-based threshold of significance option and concluded: "Because the Proposed Project-related operational

46

emissions would be less than the BAAQMD draft guideline level of 4.6 MTCO2E per service population per year, project-related GHG emissions would result in a less-than-significant impact on climate change.  No mitigation is required."

The EIR fully disclosed the increased GHG emissions from construction-related activities.  Notwithstanding this increase, the EIR concluded that GHG emissions would not reach a threshold of significance for the reasons discussed above.  The foregoing constitutes substantial evidence supporting the City's determination that the GHG impacts of the project would be less than significant.

## D.  Reasonable Range of Feasible Alternatives

Appellants contend the City did not consider a "range of reasonable alternatives to the project" (Guidelines, § 15126.6) as required by CEQA.  Appellants focus upon "historic preservation" alternatives.

The six project alternatives analyzed in the EIR included a "No Project Alternative"; an alternative that would fully avoid the project's impact to a Parkmerced historic district ("Retention of the Historic District Central Core Alternative"); an alternative that would minimize but not fully avoid this impact ("Partial Historic District Alternative"); and three other alternatives proposing different configurations of development and transit options ("Buildout Under Current Zoning Regulations Alternative," "Full Project Buildout with Transit Options Alternative," and "No Muni Realignment Alternative").

The FEIR also discussed three alternatives that were considered, but not analyzed further because they were rejected as "infeasible" or failed to meet most of the project sponsor's objectives, although they might have reduced the project's significant impacts.  These included an "Infill Development within the Historic District Alternative," suggested by letters from the National Trust for Historic Preservation and the City's Historic Preservation Commission, that would retain existing garden apartments, but construct new buildings within the garden apartment blocks; a "West-Side Partial Historic District Alternative," that would partially, but not fully, avoid the impact to historic resources; and an "Alternative Location" option.  Both of the rejected historic

district alternatives presented similar benefits and impacts to the "Partial Historic District" that was included in the EIR.[18] The EIR described how each of the two rejected alternatives would still cause significant adverse impacts on the Parkmerced historical resource and explained that they did not meet most of the project sponsor's objectives,

---

[18] The EIR described the "Infill Development within the Historic District" alternative as one that "would retain the majority of the existing buildings and landscape features at Parkmerced, and include new construction of a series of 3- to 14-story infill buildings on the sites of the existing carports and adjacent to the existing towers. . . . Under this scenario, all of the existing 3,221 residential units would remain, and about 1,400 new units would be constructed (a total of 4,621 residential units on site). There would be no transit or infrastructure improvements made under this scenario, nor would there be any combination of renewable energy sources, such as wind turbines and photovoltaic cells, to offset any portion of energy demand."

The EIR explained that "[t]his potential EIR alternative was considered but not selected for analysis in this EIR because it would not achieve most of the Project Sponsor's objectives including those related to maximizing the opportunity to create high-density housing near a commercial core, transportation and infrastructure improvements, and sustainability. Additionally, although this potential EIR alternative would reduce impacts on the Parkmerced historic district resource by retaining most of its existing physical features, this potential EIR alternative would not retain this resource's essential integrity as it would require demolition of the carports within the garden apartment courtyards and construction of new residential structures within the courtyards. As such, this potential alternative would result in a significant adverse impact on the Parkmerced historic district resource." (Fn. omitted.)

The EIR recognized "The West Side – Partial Historic District" alternative preserving a partial historic district would retain some of the garden courtyard apartment blocks on the west side, for a total of 2,365 existing units. 4,100 new residential units would be constructed. However, unlike the proposed project, there would be no renewable energy sources to offset any portion of energy demand. The alternative was considered but not selected for analysis in the EIR because it, too, would not achieve the project sponsor's objectives "related to maximizing the opportunity to create high-density housing near a community center, sustainability, and financial feasibility." Further, although a portion of the existing historic district resource would be retained as a representative sample, the retained portion would not be sufficient to convey its historic and architectural significance to justify its eligibility for inclusion in the California Register for Historic Resources. "The Historic District Core Alternative was chosen for analysis since it would retain eligibility as an historic district."

including those related to high-density housing near a commercial core, transportation and infrastructure improvements, and sustainability.

The EIR explained that "[t]he alternatives analyzed in the EIR were developed in part to identify those that could avoid or substantially lessen one or more of the significant impacts identified for the Proposed Project," including some impacts related to Historic Architectural Resources. However, the EIR also recognized that some of the impacts on Historic Architectural Resources were unavoidable, even with implementation of mitigation measures. In addition to the "no project" alternative, the EIR identified the environmentally superior alternative—that having the fewest significant environmental impacts from among the alternatives evaluated—as the "Retention of the Historic District Central Core Alternative," "due to its reduced historic and cultural resource impacts."

"An EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives. *An EIR need not consider every conceivable alternative to a project. Rather it must consider a reasonable range of potentially feasible alternatives that will foster informed decisionmaking and public participation.* An EIR is not required to consider alternatives which are infeasible. The lead agency is responsible for selecting a range of project alternatives for examination and must publicly disclose its reasoning for selecting those alternatives. There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553 [(*Goleta*)] and *Laurel Heights* [*I, supra,* ] 47 Cal.3d 376)." (Guidelines § 15126.6, subd. (a), italics added.)

"CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose." (*Goleta, supra,* 52 Cal.3d at p. 566.) *Goleta* reaffirmed "the principle that an EIR for any project subject to CEQA review must consider a reasonable range of alternatives to the project, *or to the location of the project*,

49

which: (1) offer substantial environmental advantages over the project proposal (. . . § 21002); and (2) may be 'feasibly accomplished in a successful manner' considering the economic, environmental, social and technological factors involved. (. . . § 21061.1; Guidelines, § 15364; [citation].)" (*Goleta*, at p. 566.) We believe the EIR in this case has done precisely that.

"[I]t is appellants' burden to demonstrate that the alternatives analysis is deficient. 'Where an EIR is challenged as being legally inadequate, a court presumes a public agency's decision to certify the EIR is correct, thereby imposing on a party challenging it the burden of establishing otherwise.' [Citation.]" (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 987 (*California Native Plant Society* ).)

Furthermore, under the Guidelines, an EIR need discuss only a range of reasonable alternatives. (Guidelines, § 15126.6, subds. (a), (c); *California Native Plant Society, supra,* 177 Cal.App.4th at p. 992; 1 Kostka & Zischke, *supra*, § 15.17, p. 15-24.) "An EIR that discusses a reasonable range of alternatives is not deficient simply because it excludes other potential alternatives from its analysis. [(*City of Maywood v. Los Angeles Unified Sch. Dist.* (2012) 208 Cal.App.4th 362, [421];[19] *Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, [348, 354-355].)] Each case must be reviewed on the facts, and the facts must, in turn, be reviewed in light of the purpose of CEQA's alternatives requirement. [Citations.]" (1 Kostka & Zischke, p. 15-

---

[19] "CEQA does not require that an agency consider specific alternatives that are proposed by members of the public or other outside agencies. Rather, the EIR need only discuss 'a range of reasonable alternatives.' (Guidelines, § 15126.6, subd. (a).) 'To be legally sufficient, the consideration of project alternatives in an EIR must permit informed agency decisionmaking and informed public participation. [Citation.] . . . We judge the range of project alternatives in the EIR against "a rule of reason." [Citations.] The selection will be upheld, unless the challenger demonstrates "that the alternatives are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives." [Citation.]' (*California Native Plant Society, supra,* 177 Cal.App.4th at p. 988.) [¶] This FEIR contains a reasonable range of alternatives. It compared and contrasted several project alternatives, including a no project alternative . . . ." (*City of Maywood v. Los Angeles Unified School Dist., supra,* 208 Cal.App.4th at pp. 420-421.)

24; citing *Goleta, supra*, 52 Cal.3d 553 and *Sierra Club v. City of Orange*, *supra*, 163 Cal.App.4th at p. 546.)

Appellants' argument appears to assume that all feasible alternatives must be considered, as it refers to "numerous alternatives other than those that the DEIR analyzed" and particularly to "numerous alternatives" proposed by Aaron Goodman, a former Parkmerced resident. This is not the case. As Kostka and Zischke observe, "[l]anguage in several cases implies that an EIR must discuss 'all reasonable alternatives' to the project. [Citations.] These statements, which recite a dictum in *Wildlife Alive v. Chickering* (1976) 18 C[al.]3d 190, 197, an exemption case, are inconsistent with the Guidelines standard providing that an EIR should contain a reasonable range of alternatives sufficient to foster informed decision making. [(Guidelines, § 15126.6, subd. (a).)] Under the applicable standard, an EIR may be found legally inadequate only if the range of alternatives it presents is unreasonable in the absence of the omitted alternatives." (1 Kostka & Zischke, *supra*, § 15.17, p. 15-26.)

Appellants cite *Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336 (*Preservation Action Council*) as "instructive" on the question of whether any of the various "historic preservation" alternatives was feasible. As described and distinguished in *Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 929-930: In *Preservation Action Council,* the city considered an EIR for a project to build a Lowe's store. The significant environmental impact of the project would be to demolish a historic building. The EIR included an alternative that would have allowed the building of the Lowe's, although at a reduced size, without demolishing the historic building. The EIR rejected this alternative but did not include evidence that the reduced-size alternative was infeasible. (*Preservation Action Council*, at pp. 1352-1358.) The Court of Appeal concluded: "Neither the [FEIR] nor the administrative record contains any meaningful detail or independent analysis of the validity of Lowe's claim that the reduced-size alternative is infeasible, and the City Council made no specific finding validating that claim. On this record, the trial court correctly held that the City's rejection of the reduced-size Lowe's alternative cannot be upheld." (*Id.* at p. 1357.) Tracy First's

51

reliance on *Preservation Action Council* is misplaced.  In that case, the reduced-size alternative would have saved the historic building, thus eliminating the adverse environmental impact.  Here, there is no such clear-cut reason to require a reduced-size alternative—that is, no evidence that it would substantially mitigate the significant environmental impacts.  The city council acted reasonably in certifying the EIR with the listed alternatives.

So too, in this case, there is no evidence that the two scaled-down historic district alternatives that were described, but not analyzed by the EIR—the "Infill Development within the Historic District Alternative," or the "West-Side Partial Historic District"—or other alternatives raised by comments to the DEIR would have substantially mitigated the significant environmental impacts to the historic district or that they would meet most of the objectives of the project sponsor.  In fact, *Preservation Action Council, supra,* 141 Cal.App.4th 1336, rejected the trial court's conclusion that an additional alternative— Alternative 2—should also have been analyzed in the EIR, observing that, "The City had already analyzed a range of alternatives directed at the same goal and Alternative 2 did not appear to be substantially different or potentially feasible. (*Id.* at p. 1359.)

In the words of the Court of Appeal in *California Native Plant Society, supra*, 177 Cal.App.4th 957:  "We find no violation of CEQA's informational mandates in the alternatives analysis.  The EIR presented sufficient information to explain the choice of alternatives and the reasons for excluding [the proposed alternatives].  The information 'did not preclude informed decisionmaking or informed public participation and thus did not constitute a prejudicial abuse of discretion.' [Citation.]  [¶]  As to the [public agency's] substantive decisions concerning which alternatives to analyze and which to omit, we find sufficient evidence in the administrative record as a whole to support those determinations.  Judged against the rule of reason that governs our review, a reasonable range of alternatives was selected for analysis in the EIR; 'no more was required.' [Citation.]" (*Id*. at p. 995.)

**E. Responses to Comments**

Appellants contend the FEIR failed to provide reasoned responses to comments on the DEIR. Specifically, they contend the FEIR failed to provide adequate responses to Goodman's comments on project alternatives. "A lead agency need not respond to each comment made during the review process, however, it must specifically respond to the most significant environmental questions presented." (*Browning-Ferris Industries v. City Council* (1986) 181 Cal.App.3d 852, 862.) Although they contend this was "merely one of many examples where the FEIR failed to adequately respond to comments," appellants do not point to other such claimed deficiencies in this section of their opening brief. It is appellants' burden to show the responses were inadequate. (See *Inyo Citizens for Better Planning v. Inyo County Bd. of Supervisors* (2009) 180 Cal.App.4th 1, 13; *California Native Plant Society, supra,* 177 Cal.App.4th at p. 987.)

Goodman proposed numerous alternatives other than those analyzed in the EIR. In their opening brief challenge to the adequacy of the EIR's alternatives analysis, appellants do not describe these alternatives, but only refer to Goodman's "two very extensive letters" commenting on the alleged failure of the DEIR to adequately address feasible alternatives and appellants cite to the pages of the record where some of the numerous alternatives suggested by Goodman appear. Nor do appellants attempt to describe how these suggested alternatives are significantly different from the alternatives discussed in the EIR. Instead, appellants challenge the FEIR's use of a Master Response on alternatives and separate Master Responses on historical resources and transportation, by which the FEIR generally responded to many of the hundreds of comments raised. As appellants recognize, the Master Responses and the responses to individual comment letters, pointed to similarities between proposed alternatives raised by Goodman and alternatives that were either studied or that were considered and rejected and concluded that the additional alternatives need not be considered. Appellants challenge the Master Responses as failing to respond to each of the numerous proposed alternatives and as failing "to c[o]me to grips with the specifics of the many alternatives proposed." Such a generalized challenge to the FEIR is inadequate. (Eisenberg et al., Civil Appeals and

53

Writs, *supra*, ¶ 9:21, pp. 9-6 to 9-7 ["appellate court can treat as *waived, forfeited* or *meritless* any issue that, although raised in the briefs, is *not supported by pertinent or cognizable legal argument or proper citation of authority*"]; e.g., *In re Marriage of Falcone and Fyke* (2012) 203 Cal.App.4th 964, 1004].)

Only in appellants' reply brief do they describe a *single* alternative suggested by Goodman as to which the FEIR is alleged to have inadequately responded—Goodman's "Tower Demolition" alternative.[20] Raising the issue in this manner is not sufficient. It is well established that "[p]oints raised for the first time in a reply brief *ordinarily will not be considered* because such consideration would either deprive respondent of an opportunity to counter the argument or require the effort and delay of an additional brief by permission. [Citations.]" (Eisenberg et al., Civil Appeals and Writs, *supra*, ¶ 9:78.2, p. 9-28 and cases there cited.) Appellants have waived their claim that the FEIR response to comments was inadequate by their failure to describe in their appellants opening brief the specific comments to which they maintain the FEIR did not adequately respond and the particular respects in which the responses were inadequate.

## F.  Recirculation

Appellants maintain recirculation of the DEIR was required in response to significant new information. (§ 21092.1; Guidelines, § 15088.5, subd. (a).)[21]

---

[20]  We note real party contends that the alternative for "Full Buildout Under Existing Zoning Conditions" similarly involved demolition of existing towers and was fully analyzed in the EIR, along with other alternatives relating to preservation of the historic core without demolition of the towers.

[21]  " 'A lead agency must recirculate an EIR when "significant new information" is added to an EIR after the [DEIR] has been circulated for public review.  (. . . § 21092.1; Guidelines, § 15088.5, subd. (a).)  New information added to an EIR is not "significant" unless "the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement." (Guidelines, § 15088.5, subd. (a).)' (*Clover Valley, supra,* 197 Cal.App.4th at p. 223, 128.)  [¶] . . . This guideline, however, was 'not intend[ed] to promote endless rounds of revision and recirculation of EIR's.' (*Laurel Heights Improvement Assn. v. Regents of the University of California* (1993)

54

Specifically, they contend the San Bruno gas pipeline explosion and fire was potentially significant new information. We have heretofore addressed the PG&E pipeline issue, observing the EIR discussion of the PG&E pipeline took into account the San Bruno pipeline explosion and the finding of no significant impact was supported by substantial evidence. Other than the bald assertion that the San Bruno accident "raised serious public safety impact issues about the two major PG&E pipelines bracketing the Project site," the opening brief presents no new argument demonstrating recirculation was warranted.

The only other reference in this section of their opening brief was an unspecific "new project alternatives proposed in the EIR comments" as significant new information. Again, appellants have failed to support their claim that recirculation was warranted.

## G. CEQA Findings

Appellants next contend that the CEQA findings made by the City were not supported by substantial evidence. We disagree.

"Section 21081 requires a public agency to make findings for project approvals under CEQA. The CEQA Guidelines require written findings on each significant environmental effect of a project, with each finding supported by substantial evidence and accompanied by a brief explanation of the rationale behind it. (CEQA Guidelines, § 15091, subds. (a) & (b).)[22] Put simply, the findings must 'bridge the analytic gap

---

6 Cal.4th 1112, 1132 (*Laurel Heights II*).) Rather, recirculation is 'an exception, rather than the general rule.' (*Ibid.*) [¶] 'Recirculation is not required where the new information added to the EIR merely clarifies or amplifies or makes insignificant modifications in an adequate EIR.' (Guidelines, § 15088.5, subd. (b).) An agency's decision not to recirculate the [DEIR is entitled to substantial deference; the petitioner bears the burden of proof to show no substantial evidence supports the agency's decision. (Guidelines, § 15088.5, subd. (e); [citations.]" (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors, supra,* 216 Cal.App.4th at pp. 654-655.)

   **22** Guidelines section 15091, subdivisions (a) and (b) provide:

   "(a) No public agency shall approve or carry out a project for which an EIR has been certified which identifies one or more significant environmental effects of the project unless the public agency makes one or more written findings for each of those

between the raw evidence and ultimate decision' so as to allow a reviewing court . . . 'to trace and examine the agency's mode of analysis.' (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515, 516.)" (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 496; see (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 516 (*EPIC*).)

"The findings do not need to be extensive or detailed. ' "[W]here reference to the administrative record informs the parties and reviewing courts of the theory upon which an agency has arrived at its ultimate finding and decision it has long been recognized that the decision should be upheld if the agency 'in truth found those facts which as a matter of law are essential to sustain its . . . [decision].' " ' (*Sierra Club v. California Coastal Commission* [(1993)] 19 Cal.App.4th [547,] 556.) On the other hand, mere conclusory findings without reference to the record are inadequate. (See *Village Laguna* [*of Laguna*] *Beach, Inc. v. Board of Supervisors*[, *supra*,] 134 Cal.App.3d [at p.] 1035.)" (*EPIC, supra,* 44 Cal.4th at pp. 516-517.)

Appellants suggest, but do not argue, that the Board of Supervisor's adoption of findings originally made by the Planning Commission is problematic. That is not so. (E.g., *Mira Mar Mobile Community v. City of Oceanside, supra,* 119 Cal.App.4th at

---

significant effects, accompanied by a brief explanation of the rationale for each finding. The possible findings are:

"(1) Changes or alterations have been required in, or incorporated into, the project which avoid or substantially lessen the significant environmental effect as identified in the [FEIR].

"(2) Such changes or alterations are within the responsibility and jurisdiction of another public agency and not the agency making the finding. Such changes have been adopted by such other agency or can and should be adopted by such other agency.

"(3) Specific economic, legal, social, technological, or other considerations, including provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or project alternatives identified in the [FEIR].

"(b) The findings required by subdivision (a) shall be supported by substantial evidence in the record."

p. 497 ["The environmental findings provide the required link between the facts contained in the record and the ultimate findings. . . . [I]ncorporation by reference of the earlier EIRs and associated documents was sufficient to provide the required link"]; *Vedanta Society of So. California v. California Quartet, Ltd.* (2000) 84 Cal.App.4th 517, 528 ["We do not disagree with the idea that an elected body can adopt the findings and explanations of the lower body"]; 2 Kostka & Zischke, *supra,* §§ 17.37, 17.38, pp. 17-38, 17-39.)

Appellants argue the CEQA findings are inadequate as they fail to identify the evidence relied upon. They maintain that referring to the evidence contained in the FEIR as the evidence supporting the findings is insufficient. Again, not so. There is no requirement that the findings themselves specifically identify the particular pieces of evidence and their precise locations in the record that support the findings. (See *Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 848-849 [upholding findings based on substantial evidence in the record with no suggestion that citations to the evidence were required].) "Detailed findings on an issue are not required if the basis for the agency's decision is found in the EIR and the agency's findings incorporate or adopt the EIR's discussion and analysis. [Citations.]" (2 Kostka & Zischke, *supra,* § 17.37, p. 17-38.) The requirement is that the findings disclose the *reasons* for the agency's decision. (*Id.* § 17.38, p. 17-39, citing to Guideline, § 15091, subds (a), (c) ["The findings need disclose no more than the reasons for the agency's decision]."])

The CEQA findings here provide ample explanation of the reasons for the City's decision. The "Parkmerced Project [CEQA] Findings: Findings of Fact, Evaluation of Mitigation Measures and Alternatives, and Statement of Overriding Considerations" adopted by the Planning Commission and in turn adopted and incorporated by the Board of Supervisors, allows the public and this court "to trace and examine the agency's mode of analysis." (*Topanga Assn. for a Scenic Community v. County of Los Angeles, supra,* 11 Cal.3d at pp. 515-516.) The findings made by the City about the FEIR's determinations regarding significant environmental impacts and the mitigation measures

proposed to address them are contained in Sections II, III and IV of the document. The findings are adequately detailed and specific and we have " 'no trouble under the circumstances discerning "the analytic route the administrative agency traveled from evidence to action." [Citations.]' [Citation.]" (*Great Oaks Water Co. v. Santa Clara Valley Water Dist.* (2009) 170 Cal.App.4th 956, 971.)

Appellant appears to contend the City took an impermissible "shortcut" in referring to the FEIR and adopting and incorporating the conclusions of that document, rather than repeating at length the entire analysis for each impact.[23] We find no fault in

---

[23] The CEQA findings document explains:

"The following Sections II, III and IV set forth the Planning Commission's findings about the [FEIR's] determinations regarding significant environmental impacts and the mitigation measures proposed to address them. These findings provide the written analysis and conclusions of the Planning Commission regarding the environmental impacts of the Project and the mitigation measures included as part of the FEIR and adopted by the Planning Commission as part of the Project. To avoid duplication and redundancy, and because the Planning Commission agrees with, and hereby adopts, the conclusions in the FEIR, these findings will not repeat the analysis and conclusions in the FEIR, but instead incorporates them by reference herein and relies upon them as substantial evidence supporting these findings.

"In making these findings, the Planning Commission has considered the opinions of Department and other City staff and experts, other agencies and members of the public. The Planning Commission finds that the determination of significance thresholds is a judgment decision within the discretion of the City and County of San Francisco; the significance thresholds used in the FEIR are supported by substantial evidence in the record, including the expert opinion of the EIR preparers and City staff; and the significance thresholds used in the FEIR provide reasonable and appropriate means of assessing the significance of the adverse environmental effects of the Project.

"These findings do not attempt to describe the full analysis of each environmental impact contained in the FEIR. Instead, a full explanation of these environmental findings and conclusions can be found in the FEIR and these findings hereby incorporate by reference the discussion and analysis in the FEIR supporting the determination regarding the Project impacts and mitigation measures designed to address those impacts. In making these findings, the Planning Commission ratifies, adopts and incorporates in these findings the determinations and conclusions of the FEIR relating to environmental impacts and mitigation measures, except to the extent any such determinations and conclusions are specifically and expressly modified by these findings. As set forth below, the Planning Commission adopts and incorporates the mitigation measures set

58

this process, provided the findings satisfy the requirement that they disclose the reasons for the decision and are supported by substantial evidence.  Appellants have failed to carry their burden in showing that the findings in the FEIR were inadequate.

Appellants contend the "FEIR did not contain substantial evidence to support its rejection of numerous impacts as significant."  We have previously rejected this claim.  Further, appellants fail to identify what specific impacts they contend were insufficiently addressed in the findings.  They have failed to meet their burden to overcome the presumption that the City's actions were appropriate.

Appellants argue that various project alternatives were impermissibly rejected as "infeasible" without City's identification of evidence in the record demonstrating infeasibility.  They specifically call out the "Buildout Under Current Zoning Regulations Alternative," the "Retention of the Central Core Historic District Alternative," and the

---

forth in the FEIR and the attached MMRP, except as to mitigation measures specifically rejected in Section V below, to substantially lessen or avoid the potentially significant and significant impacts of the Project.  The Planning Commission intends to adopt the mitigation measures proposed in the FEIR, with the exception of those specifically rejected in Section V below.  Accordingly, in the event a mitigation measure recommended in the FEIR has inadvertently been omitted in these findings or the MMRP, such mitigation measure is hereby adopted and incorporated in the findings below by reference.  In addition, in the event the language describing a mitigation measure set forth in these findings or the MMRP fails to accurately reflect the mitigation measures in the FEIR due to a clerical error, the language of the policies and implementation measures as set forth in the FEIR shall control.  The impact numbers and mitigation measure numbers used in these findings reflect the information contained in the FEIR.

"In the Sections II, III and IV below, the same findings are made for a category of environmental impacts and mitigation measures.  Rather than repeat the identical finding dozens of times to address each and every significant effect and mitigation measure, the initial finding obviates the need for such repetition because in no instance is the Planning Commission rejecting the conclusions of the FEIR or the mitigation measures recommended in the FEIR for the Project, except as specifically set forth in Section V below."

59

"No Project" alternative as lacking substantial evidence in the record to show infeasibility. The findings are set forth in relevant part in the margin.[24] [25] [26]

---

[24] The City adopted the findings made by the Planning Commission with respect to the "Buildout Under Current Zoning Regulations" alternative. The findings included a description of the pros and cons of the alternative and then continued:

"The Commission rejects the Buildout under Current Zoning Regulations Alternative because it would not reduce any of the other significant and unavoidable impacts of the Proposed Project; would not reconfigure the Project Site's streets in accordance with the Better Streets Plan, would not provide new and more usable open spaces such as a park; would not provide a more fine-grained system of streets and pathways and therefore correct the deficiencies of the current site plan; would not provide neighborhoodserving retail and commercial uses in close proximity to residential uses, and therefore would not provide the same opportunities to reduce automobile use; it would increase the severity of traffic impacts on local intersections; it would not reduce stormwater flows in the City's combined sewer collection and treatment system; and it would not provide open space in such usable configurations as that in the Proposed Project and therefore would not provide high-quality open space to serve the residents within walking distance.

"For these reasons, the Commission finds that, on balance, the Proposed Project is preferable to the Buildout under Current Zoning Regulations Alternative, and that alternative is rejected as infeasible."

[25] Similarly, the findings regarding the "Retention of the Historic District Central Core Alternative" set out a description of the pros and cons of the alternative (including recognition that "[t]his alternative would result in the addition of about 2,346 new units to the City's housing stock, about 3,300 fewer than in the Proposed Project. This alternative would include about 205,000 sq. ft. of retail, commercial, and community uses, about 100,000 sq. ft. less than in the Proposed Project") and then continued:

"The Commission rejects the Retention of the Historic District Central Core Alternative because it would add fewer residential units to the City's housing stock and therefore contribute less to the City and regional housing needs allocation; it would add fewer residential units in [an] urban infill location; it would provide less residential density and therefore would be less consistent with the City's goal to create a sustainable and self-sufficient 'better' neighborhood that supports neighborhood serving retail, community facilities and tran[si]t infrastructure and service; although it would reduce, it would not eliminate significant transportation impacts; it would require that the majority of new housing be situated on a portion of the project site that is farthest from the Muni M Ocean View light rail line and therefore would be less likely to result in a reduction of automobile dependency; it would not reduce wet-weather flows in the City's combined wastewater collection and treatment system; it would provide fewer employment

60

Appellants argue that the alternatives would reduce or eliminate one or more of the project's significant environmental impacts, and that the findings and the FEIR do not identify any factual basis for finding these alternatives to be infeasible. First, the suggestion that an alternative may not be rejected as infeasible so long as it would result in fewer significant environmental impacts is mistaken. Alternatives may properly be rejected as infeasible based on economic, social, or other conditions, notwithstanding that the alternatives may cause fewer significant environmental impacts than the proposed

opportunities both during construction and in new retail and office space; it would not provide the reconfiguration of the street system in accordance with the Better Streets Plan; would not provide a more fine-grained system of streets and pathways and therefore correct the deficiencies of the existing automobile-oriented streets and site plan; would not reconfigure the open space at the Project Site to provide more usable open spaces such as a park; and would not re-route the M Ocean View light rail line into the Project Site, because doing so would negatively impact the historic resource, and therefore would be less consistent with the City's Transit First policy. For these reasons, the Commission finds that, on balance, the Proposed Project is preferable to the Historic District Central Core Alternative, and this alternative is rejected as infeasible."

[26] The City found with respect to the "No Project" alternative:

"Under the No Project Alternative, the site would remain in its existing condition, no existing buildings or landscaping would be demolished and no new buildings would be constructed. No on- or off-site infrastructure improvements would be constructed. The physical impacts identified in the [FEIR] for the Proposed Project would not occur.

"The No Project Alternative would not provide additional density in an underutilized area of the City, would not add up to 5,679 additional residential units to the City's housing stock, would not help reduce the shortage of affordable housing in the City, would not help the City meet its regional housing needs allocation, would not improve transit service and facilities in the southwest quadrant of the City, would not reduce wet-weather flows in the City's combined wastewater collection and treatment system, would not provide employment opportunities either during construction or in new retail and office space in the neighborhood core, and would not provide opportunities for renewable energy generation.

"Further, this alternative would not improve the City's revenues by adding new residential and commercial space to the City's inventories.

"For these reasons, the Commission finds that, on balance, the Proposed Project is preferable to the No Project Alternative and that the No Project alternative is rejected as infeasible."

61

project. (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 731 [CEQA does not compel adoption of one of the alternative projects if it would avoid the identified environmental damage. It merely required the agency to weigh the feasibility of the proposed alternatives and to make findings regarding feasibility]; see *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco, supra,* 102 Cal.App.4th at p. 695 ["CEQA does not require that an agency select the alternative course most protective of the environmental status quo"].)

Second, the term "feasible" does not simply mean "possible." If so, few projects would go forward. (*Sierra Club, supra,* 121 Cal.App.4th at p. 1510 [applying CEQA case law to interpretation of "infeasible" in a specific plan].) " '[F]easibility' under CEQA encompasses 'desirability' to the extent that desirability is based on a reasonable balancing of the relevant economic, environmental, social, and technological factors.' " (*City of Del Mar v. City of San Diego* (1982) 133 Cal.App.3d 401, 417.) To determine whether an alternative is infeasible, "an agency must necessarily weigh and balance its pros and cons taking account of a broad range of factors. [Citations.]" (2 Kostka & Zischke*, supra,* § 17.29, p. 17-29, citing Pub. Res. Code §§ 21061.1, 21081, subd. (a)(3); and Guidelines, §§ 15091, subd. (a)(3), 15346.) "After weighing these factors, an agency may conclude that a mitigation measure or alternative is impractical or undesirable from a policy standpoint and reject it as infeasible on that ground." (*Ibid;* see also, *California Native Plant Society, supra,* 177 Cal.App.4th at p. 1001 [where alternatives would not accomplish city's policy goals of promoting transportation alternatives and access to persons with disabilities, agency was allowed to weigh policy considerations in rejecting alternatives as infeasible]; *City of Del Mar,* at p. 417 [alternatives found infeasible where they conflict with agency planning goals].)

In this case, findings on the three alternatives identified by appellants were adequate and were supported by substantial evidence in the record.

## IV. Due Process

Appellants contend the trial court erred in dismissing appellant PMAC's due process claim upon real party's demurrer. We find no error.

62

The eighth cause of action alleged that as tenants of Parkmerced, members of PMAC hold property rights associated with their rent-controlled units, that they will be displaced by the Project Approvals and the development agreement, that they have a due process right to notice and an opportunity to be heard, and that these rights were violated by the refusal to properly provide notice to them and to allow them to re-address the Board following significant changes to the development agreement and to Project Approvals affecting their property rights. The last minute changes to the development agreement added provisions that in the event a court challenge invalidates the rent control provision, real party will provide the tenants with relocation assistance and damages that will compensate them for the loss. These changes were made in the attempt to minimize any uncertainty about tenants' ability to retain rent control in the new units whatever the impact of Costa-Hawkins Rental Housing Act.

Appellants acknowledge the well-settled rule that "only those governmental decisions which are adjudicative in nature are subject to procedural due process principles." (*Horn v. County of Ventura* (1979) 24 Cal.3d 605, 612 (*Horn*).) "Legislative action generally is not governed by these procedural due process requirements because it is not practical that everyone should have a direct voice in legislative decisions; elections provide the check there. [Citation.]" (*Calvert v. County of Yuba* (2006) 145 Cal.App.4th 613, 622; see *Horn,* at p. 613; *Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482.) Appellants also acknowledge that the approval of a development agreement is a legislative act. (Gov. Code, § 65867.5, subd. (a) ["A development agreement is a legislative act that shall be approved by ordinance and is subject to referendum"]; see generally, *Arnel Development Co. v. City of Costa Mesa* (1980) 28 Cal.3d 511, 523 (*Arnel*) ["past California land-use cases have established generic classifications, viewing zoning ordinances as legislative and other decisions, such as variances and subdivision map approvals, as adjudicative"].) Nor do appellants dispute that the approvals at issue here are classified as *legislative* acts.

Nevertheless, appellants posit the novel theory that a development agreement, while not a project approval, is an *entitlement* and not a "law of general applicability."

63

Therefore, appellants contend, approval of the development agreement is subject to due process protections, despite its characterization by statute as a legislative action. No case cited by appellants supports this argument—that a legislative act may trigger procedural due process rights when it is arguably not a law of general applicability. Such holding would upset well-established legislative-adjudicative act categorical distinctions and likely would cause uncertainty and confusion. California courts are not required to conduct an individualized assessment into the type of land use decision at issue. (*Arnel, supra,* 28 Cal.3d at p. 517.) In *Arnel,* the California Supreme Court held that a zoning ordinance is a legislative act that may be enacted by initiative, whatever the size of parcel or number of landowners affected, unlike administrative zoning decisions, adjudicatory in nature, such as the grant of a variance or the award of a conditional use permit. (*Id.* at pp. 514-515.) The court emphasized the "problems courts will face if we abandoned past precedent and attempted to devise a new test distinguishing legislative and adjudicative decisions." (*Id.* at pp. 522-523.)

As respondents point out, appellants rely on a handful of cases as supporting the expansion of due process protection where a legislative act "exceptionally affected" a small number of people. (See *Bi-Metallic Inv. Co. v. State Board of Equalization* (1915) 239 U.S. 441, 446 (*Bi-Metallic*) [distinguishing *Londoner v. Denver* (1908) 210 U.S. 373, as involving a "relatively small number of persons, . . . who were exceptionally affected, in each case upon individual grounds"]; *Harris v. County of Riverside* (9th Cir. 1990) 904 F.2d 497, 502 [holding that due process applied to zoning ordinance that " 'exceptionally affected' " Harris's land].) None of these cases would apply due process requirements to the approval of a general plan amendment, zoning ordinance or development agreement encompassing 152 acres and affecting renters in more than 1,500 units. (See *Arnel, supra,* 28 Cal.3d at pp. 522-523.) As *Bi-Metallic* recognized in finding no due process right at issue in that case: "Where a rule of conduct applies to more than a few people, it

is impracticable that every one should have a direct voice in its adoption." (*Id.* at p. 445.)[27]

Moreover, insofar as approval of the development agreement requires consideration of broad-based policy issues and the exercise of legislative discretion, it is conduct that does not fit well within the framework of adjudicatory decisions. (See *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 443-444 (*Mammoth Lakes*).)[28] Whether or not approval of the development agreement here is conduct applying to more than a few people, it is undisputed that under state law the approval of the development agreement is a

---

[27] Contrary to appellants' characterization, *Bi-Metallic, supra,* 239 U.S. at page 445, *did not strike down* a Colorado statute that established a procedure for taxing property owners for the cost of street improvements, without affording them prior notice and an opportunity for hearing. Rather, the Supreme Court concluded that an order of the tax commissioner and State Board of Equalization requiring local taxing officer to increase assessed valuation *did not violate due process* and it *affirmed* the lower court's order dismissing the action. (*Id.* at pp. 444, 446.)

[28] "A development agreement is a statutorily authorized agreement between a municipal government . . . and a property owner for the development of the property. (Gov. Code, § 65865, subd. (a).) One of the main components of a development agreement is a provision freezing the municipality's rules, regulations, and policies governing permitted uses of land and density of the land use, as well as standards and specifications for design, improvement, and construction. (Gov. Code, § 65866.) This provision allows a developer to make long-term plans for development without risking future changes in the municipality's land use rules, regulations, and policies. (*Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors* (2000) 84 Cal.App.4th 221, 227 (*SMART*).)

"The development agreement must be approved by ordinance and is, therefore, a 'legislative act.' (Gov. Code, § 65867.5, subd. (a).) Because the development agreement is approved by ordinance, it is subject to referendum, which allows the electorate to overturn approval of the agreement. (*Ibid.*) While, as a legislative act, a development agreement can be disapproved by referendum, an unchallenged development agreement is an enforceable contract between the municipality and the developer. Depending on its terms, it may create vested rights in the developer with respect to land use. (See *SMART, supra,* 84 Cal.App.4th at p. 230 [development agreement creates commitments to developers].)" (*Mammoth Lakes, supra,* 191 Cal.App.4th at pp. 443-444.)

65

*legislative* act. As such, it has long been held that no procedural due process rights attach.

Nor do we find persuasive appellant's theory that because the development agreement granted a vested right to the developer, "locking in" the regulatory framework under which further approvals would be considered, Parkmerced tenants necessarily acquired vested rights entitling them to procedural due process. That the development agreement may provide a vested right to the developer does not necessarily take away vested rights from PMAC or its members. Moreover, courts have repeatedly rejected the claim that an approval should be subject to procedural due process requirements simply because it affects property rights in some manner. Legislative actions often involve approvals affecting individual property rights. (E.g., *Oceanside Marina Towers Assn v. Oceanside Community Development Com.* (1986) 187 Cal.App.3d 735, 745 (*Oceanside Marina Towers*) [despite "substantial impact on surrounding properties," public entity's selection of a site for a new public improvement consistently has been held to be a quasi-legislative act exempt from due process hearing requirements].)

Appellant contends that under *Horn, supra,* 24 Cal.3d 605, a property owner whose property interest would be directly and significantly affected by granting a vested right to another property has a right to due process. However, *Horn* first concluded that approval of a tentative subdivision map was "adjudicatory" in nature. (*Id.* at p. 614 ["Subdivision approvals, like variances and conditional use permits, involve the application of general standards to specific parcels of real property. Such governmental conduct, affecting the relatively few, is 'determined by facts peculiar to the individual case' and is 'adjudicatory' in nature"].) Only *thereafter* did the court address the argument of the subdivider that the plaintiff neighbor had suffered no significant deprivation of property which would invoke constitutional rights to notice and hearing. As to that point, the court held that "*whenever approval of a tentative subdivision map will constitute a substantial or significant deprivation of the property rights of other landowners, the affected persons are entitled to a reasonable notice and an opportunity to be heard before the approval occurs.*" (*Id.* at p. 616, italics added.) In this case, having

66

properly determined the first question, that a legislative act was involved to which act procedural due process did not attach, the trial court was not required to analyze whether the members of PMAC suffered a substantial or significant deprivation of property rights. (See *Oceanside Marina Towers, supra,* 187 Cal.App.3d at p. 744.)

Because the character of the development agreement approval is a legislative act, and it has long been established that procedural due process rights to notice and hearing do not attach to such acts, we conclude the court did not err in sustaining the demurrer to the eighth cause of action.[29]

## V.  Administrative Record

Appellants contend the trial court erred in including in the administrative record transcripts of a set of hearings before the LUEDC of the Board.  Appellants contend transcripts of the LUEDC hearings were not relevant to the City's decision because these documents were not before the decision maker—the Board—when it certified the EIR for the project on June 6, 2010.

### A.  Facts

From August 10, 2010 to May 24, 2011, the LUEDC, a committee of the Board, held five meetings to consider the project and development agreement.  The last of these was held the morning of May 24, hours before the Board considered and certified the EIR appeal and the project.  At both the May 16 and May 24 meetings, the LUEDC discussed and approved amendments to the approvals.  At the end of the May 24 hearing, the LUEDC forwarded the amended documents to the Board without recommendation.

On the afternoon of May 24, the Board heard the appeal of the EIR, denied the appeal and approved the project.  On June 6, 2011, the Board finalized the Project Approvals.  In certifying the EIR, the Board found that "the FEIR files and all

---

[29]  Our determination of this issue makes it unnecessary to address respondents' further claim that appellants failed to adequately allege they had insufficient opportunity to present their case against approval of the development agreement and the project to the Board or that they could have been prejudiced by the strengthening of the tenant relocation program protections.

correspondence and other documents have been made available for review by this Board and the public. These files are available for public review by appointment at the Planning Department offices at 1650 Mission Street, and are *part of the record* before this Board by reference in this motion . . . ." (Italics added.) (§ 21081.6, subd. (a)(2).) Audio and video files of the LUEDC hearings were televised on SFGovTV and those hearings were generally available for viewing in the Board of Supervisors' offices and on the City's website.

Following the filing of their petition for writ of mandate in the superior court, appellants moved to "clarify the record" (*Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 62 (*Madera*), disapproved on other grounds in *Neighbors for Smart Rail v. Exposition Metro Line Const. Authority* (2013) 57 Cal.4th 439), seeking to exclude from the administrative record transcripts of various hearings on the project, including the LUEDC hearings.[30] The trial court granted the motion in part and ordered: "The transcripts for San Francisco's Historic Preservation Commission hearing on June 2, 2010, and for all of the hearings of the Board of Supervisors' [LUEDC] relating to the Parkmerced Project, are within the scope of the administrative record, and shall be included in the record. The transcripts for these hearings are within the scope of [section] 21167.6. Transcripts of these hearings must be prepared, certified as a true and accurate record of the proceedings, and included in the administrative record. . . ."

## B. Standard of Review

"We review a trial court's determination to include or exclude a document from the administrative record pursuant to the mandatory language of subdivision (e) of

---

[30] Respondents contend that as to LUEDC hearings, appellants' motion objected only the transcript for the May 24, 2011—the last hearing before the Board's EIR certification. Although the record is not entirely clear, we tend to agree with respondents that only the May 24, 2011 hearing was specifically challenged. However, the court obviously believed appellants were challenging a group of LUEDC hearings. As our analysis applies to the LUEDC hearing of May 24, 2011, it necessarily applies to LUEDC hearings preceding that date as well.

section 21167.6 by applying the following ordinary principles of appellate practice. [¶] The trial court's findings of fact are reviewed under the substantial evidence standard. [Citation.] The trial court's conclusions of law are subject to independent review on appeal. [Citation.] [¶] In addition to the foregoing standards of review, appellate review of a trial court's determinations regarding the scope of the administrative record is subject to the principle that appellate courts presume the trial court's order is correct. [Citation.] This presumption produces the corollaries that (1) an appellant must affirmatively demonstrate an error occurred and (2) when the appellate record is silent on a matter, the reviewing court must indulge all intendments and presumptions that support the order or judgment. [Citation.] The intendments and presumptions indulged by the appellate court include inferring the trial court made implied findings of fact that are consistent with its order, provided such implied findings are supported by substantial evidence." (*Madera, supra,* 199 Cal.App.4th at p. 65, fn. omitted.)

## C. Section 21167.6

As *Madera, supra,*199 Cal.App.4th 48, recognized: "The contents of the administrative record are governed by subdivision (e) of section 21167.6,[31] which

---

**31** "(e) The record of proceedings shall include, but is not limited to, all of the following items: [¶] . . . [¶]

"(2) All staff reports and related documents prepared by the respondent public agency with respect to its compliance with the substantive and procedural requirements of this division and with respect to the action on the project. [¶] . . . [¶]

"(4) Any transcript or minutes of the proceedings at which the decisionmaking body of the respondent public agency heard testimony on, or considered any environmental document on, the project, and any transcript or minutes of proceedings before any advisory body to the respondent public agency that were presented to the decisionmaking body prior to action on the environmental documents or on the project. [¶] . . . [¶]

"(7) All written evidence or correspondence submitted to, or transferred from, the respondent public agency with respect to compliance with this division or with respect to the project. [¶] . . . [¶]

"(10) Any other written materials relevant to the respondent public agency's compliance with this division or to its decision on the merits of the project, including the

begins: 'The record of proceedings shall include, but is not limited to, all of the following items: . . . .' Subdivision (e) then enumerates 11 categories of material that must be included in the administrative record. . . . [¶] The quoted statutory language is relevant to establishing the legal context for this appeal. First, the language is mandatory—*all* items described in any of the enumerated categories *shall* be included in the administrative record. [Citation.] Second, the statutory phrase 'include, but is not limited to' indicates the extensive list provided in the statute is *not exclusive.* 'It has been observed that this section "contemplates that the administrative record will include pretty much everything that ever came near a proposed development or to the agency's compliance with CEQA in responding to that development." (*County of Orange v. Superior Court* (2003) 113 Cal.App.4th 1, 8, italics omitted . . . .)' (*Eureka Citizens for Responsible Government v. City of Eureka, supra,* 147 Cal.App.4th at pp. 366-367.)" (*Id.* at pp. 63-64.)

Section 21167.6, subdivision (e)(10) includes "[*a*]*ny other written materials relevant to the respondent public agency's compliance with this division or to its decision on the merits of the project* . . . ." A broad "interpretation of 'other written materials,' . . . stands in harmony with the introductory language in section 21167.6, subdivision (e) that states the 'record of proceedings shall include, *but is not limited to* . . . .' (Italics added.) This language demonstrates that the Legislature intended courts to avoid narrowly applying the 11 categories set forth in section 21167.6, subdivision (e) when such an application would subvert the purposes underlying CEQA." (*Consolidated Irrigation Dist. v. Superior Court* (2012) 205 Cal.App.4th 697, 718 (*CID*).) The audio recordings of the LUEDC hearing (and their later transcriptions) constitute " 'other written materials

initial study, any drafts of any environmental document, or portions thereof, that have been released for public review, and copies of studies or other documents relied upon in any environmental document prepared for the project and either made available to the public during the public review period or included in the respondent public agency's files on the project, and all internal agency communications, including staff notes and memoranda related to the project or to compliance with this division." (§ 21167.6, subd. (e).)

relevant to' " the agency's " 'decision on the merits of the project' " (*id*. at pp. 714, 716) and, therefore, were *required* to be included in the administrative record.[32] (*Id.* at p. 703 ["tape recordings of public agency hearings qualify as 'other written materials' for purposes of [this subdivision], and, therefore, copies of tape recordings should have been included in the record of proceedings that City lodged with the trial court"].)

Relying upon *Western States, supra,* 9 Cal.4th at pages 571-572, appellants contend the LUEDC hearings evidence was not *before the decisionmakers when they made their decision.* However, *Western States* did not concern the issue of what documents were properly included in the administrative record. Rather, it addressed the issue whether evidence admittedly *not contained in the administrative record* was admissible in a traditional mandamus action under CEQA to determine that the agency had abused its discretion within the meaning of section 21168.5. (*Western States,* at p. 565.) The Supreme Court held "courts generally may not consider evidence not contained in the administrative record when reviewing the substantiality of the evidence supporting a quasi-legislative administrative decision under . . . section 21168.5" and that "extra-record evidence is generally not admissible to show that an agency 'has not proceeded in a manner required by law' in making a quasi-legislative decision." (*Ibid.*)

Appellants contend that it is not sufficient documents were "available to" the decisionmakers before they made their decision. *Western States,* certainly stands for the proposition that documents generated *after* the Board decision are generally inadmissible on the abuse of discretion issue. However, it nowhere holds that the documents must be identified in the motion affirming certification of the EIR in order to be "before the decisionmaker." Appellants' attempt to extract support for their position from *CID, supra,* 205 Cal.App.4th at pages 718-723, is unavailing. That part of the *CID* opinion addressed whether documents referenced in comment letters on the DEIR should be

---

[32] The court also properly required transcripts to be prepared for each hearing pursuant to California Rules of Court, rule 2.1040(a), requiring audio recording introduced into evidence be accompanied by a typewritten transcript. (See *Darley v. Ward* (1980) 28 Cal.3d 257, 263.)

included in the administrative record under section 21167.6, subdivision (e)(7).  In determining whether such documents were " 'submitted to" the public agency, the court used the general meaning of "presented or made available for use or study."  (*CID*, at pp. 723-724.)  The court held documents that were "readily available for use by City personnel" and documents named in a comment letter along with a *specific* Web page at which the document could be easily located, together with a specific request that they be included in the record satisfied the statute; whereas documents referenced with a citation to a general Website were "not made readily available to City and, therefore, are not part of the record of proceedings under section 21167.6, subdivision (e)(7)."  (*Id.* at p. 724.)  Not only does this portion of *CID* interpret a different part of the statute, but the question whether documents and other evidence referenced in comment letters by the public are "readily available" to the City is patently distinguishable from the question of the ready availability to the City of the City's own hearings.  The court could certainly conclude that members of the Board of Supervisors did not need instruction on where to find the recordings of its committee meetings.

Furthermore, the LUEDC hearings undisputedly occurred *before* the Board of Supervisor's decision.  The Board's motion that it had "heard testimony and received public comment regarding the adequacy of the FEIR" is reasonably determined to include public testimony before Board committees.  Under the Board's Rules of Order, the full Board did not take separate public testimony on matters that were before a Board Committee.  (Former Board of Supervisors' Rule of Order 1.5(b), effective February 15, 2011 ["If a committee has provided the opportunity for public testimony and forwarded an ordinance, resolution, or motion to the full Board, the Board does not provide a second opportunity for public testimony at the full Board meeting"].)  Testimony received by the Board as to the adequacy of the FEIR includes the testimony submitted on project approvals at committee hearings preceding the determination.

Appellants have failed to show that the trial court erred in determining the LUEDC hearings were properly part of the administrative record.

## D.  No Prejudice

Finally, we agree with respondents that even if the LUEDC committee's transcripts were not part of the administrative record, the trial court's order of inclusion would not constitute reversible error, absent a showing by appellants as to how they were prejudiced by the inclusion of the transcripts.  Appellants have not tried to demonstrate actual prejudice, but rely upon a theory that *any* violation of CEQA's procedural mandates is "presumptively prejudicial," citing *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 137.[33]

Recently, our Supreme Court has explained:  "An omission in an EIR's significant impacts analysis is deemed prejudicial if it deprived the public and decision makers of substantial relevant information about the project's likely adverse impacts.  Although an agency's failure to disclose information called for by CEQA may be prejudicial 'regardless of whether a different outcome would have resulted if the public agency had complied' with the law (§ 21005, subd. (a))*, under CEQA 'there is no presumption that error is prejudicial'* (§ 21005, subd. (b)).  Insubstantial or merely technical omissions are not grounds for relief.  ([*EPIC*]*, supra,* 44 Cal.4th at pp. 485-486.)  'A prejudicial abuse of discretion occurs if the *failure to include relevant information* precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.'  [Citation.]"  (*Neighbors for Smart Rail v. Exposition Metro Line Const. Authority* (2013) 57 Cal.4th 439, 463, italics added.)

Insofar as prejudice resulting from the inclusion of *too much information* in the administrative record is concerned, the court in *County of Orange v. Superior Court,*

---

[33]  In *Mountain Lion Foundation*, the court held the Fish and Game Commission had abused its discretion in delisting the Mojave ground squirrel where it failed to respond in writing to significant environmental opposition and gave no meaningful consideration to the "no project" alternative to delisting the species.  Consequently it did not proceed in accordance with procedures mandated by law.  The court cited *Sierra Club v. State Board of Forestry* (1994) 7 Cal.4th 1215, 1235-1237, and in ellipses characterized its holding as "[failure to proceed in accordance with law presumptively prejudicial when mandatory procedures not followed]."  (*Mountain Lion Foundation, supra,* 16 Cal.4th at p. 137.)

73

*supra,* 113 Cal.App.4th 1, had this to say: "[W]hen it comes to the administrative record in a CEQA case, any *reduction* in its contents is *presumptively* prejudicial to project proponents. [Citation.] It is, after all, the project proponents who will be saddled with the task of pointing to things in the record to refute asserted inadequacies in the EIR. By all rights, then, *the burden of showing prejudice from any overinclusion of materials into the administrative record must be on the project opponents*, who have the most to gain from any underinclusion. [Citations.]" (*Id.* at p. 13, italics added.) We agree.[34]

## DISPOSITION

The judgment in favor of respondents is affirmed.

---

[34] Appellants' motion to strike portions of respondents' answer to the brief of amici curiae Sierra Club and California Preservation Foundation has been granted in part in our order filed October 28, 2013. We hereby deny the motion as to the remaining portions of respondents' answer to the amici brief.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Brick, J.*


＊ Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A137753, *San Francisco Tomorrow et al. v. City and County of San Francisco et al.*

Trial Court:                                          San Francisco Superior Court

Trial Judge:                                          Hon. Teri L. Jackson


Attorneys for Plaintiffs and Appellants:             Law Offices of Stuart M. Flashman
                                                     Stuart M. Flashman

Attorneys for Amicus Curiae on behalf of             Chatten-Brown & Carstens
Plaintiffs and Appellants:                           Jan Chatten-Brown
                                                     Josh Chatten-Brown

Attorneys for Defendants and Respondents:            San Francisco City Attorney
                                                     City Attorney Dennis J. Herrera
                                                     Kate H. Stacy
                                                     Audrey Williams Pearson
                                                     Brian F. Crossman

Attorneys for Real Party in Interest and             Gibson Dunn & Crutcher
Respondent:                                          Daniel Kolkey
                                                     Jeffrey D. Dintzer
                                                     Matthew C. Wickersham